UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| MILITARY ROAD REVITALIZATION COMPANY, LLC AND BCP NORTHSHORE PROPERTIES, LLC | CIVIL ACTION NO. |
| | JUDGE: |
| VERSUS | SECTION: |
| ST. TAMMANY PARISH GOVERNMENT | MAGISTRATE: |

## **COMPLAINT FOR DECLARATORY AND MONETARY RELIEF**

Plaintiffs, Military Road Revitalization Company, LLC and BCP Northshore Properties, LLC bring this action against Defendant, the St. Tammany Parish Government, based on its discriminatory, unconstitutional, and unlawful actions that delayed, prevented, and otherwise interfered with Plaintiffs' attempt to construct in the City of Covington a multifamily, affordable housing apartment complex for (a) workforce or low-to-moderate income households and (b) permanent supportive housing for persons with disabilities. Plaintiffs seek both declaratory and monetary relief.

# TABLE OF CONTENTS

Parties ........................................................................................................................................... 3

Jurisdiction and Venue ................................................................................................................. 3

Facts ............................................................................................................................................. 5

   St. Tammany Parish's Need for Additional Housing Stock ........................................................ 5

   The Covington Trace Ridge Apartments Will Provide Low-to-Moderate Income Housing and
   Permanent Supportive Housing for Persons with a Disability .................................................. 13

   The Parish's Moratorium on Construction of New Multifamily Buildings .............................. 18

   The Parish Rejects A Resolution to Resolve Litigation Against the Developer ...................... 28

Claims ........................................................................................................................................ 32

   Count 1: Fair Housing Act, 42 U.S.C. § 3604 and 42 U.S.C. § 3617 ..................................... 32

   Count 2: Louisiana Equal Housing Opportunity Act, LA. REV. STAT. § 51:2601 ................... 42

   Count 3: Americans with Disabilities Act, 42 U.S.C. § 12131, and the Rehabilitation Act, 28
   U.S.C. § 794 ............................................................................................................................. 43

   Count 4: Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d et seq. ........................... 45

   Count 5: Civil Action for Deprivation of Rights, 42 U.S.C. § 1983 and the Louisiana
   Constitution .............................................................................................................................. 46

Prayer for Relief ......................................................................................................................... 49

## PARTIES

1.     Plaintiff, Military Road Revitalization Company, LLC ("MRRC") and its affiliates (the "Developer"), is a Louisiana limited liability company domiciled at 812 Gravier Street, Suite 200, New Orleans, Louisiana 70112. The Developer is an entity owned and managed by HRI Communities ("HRIC"), a national real estate company focused on creating high-quality mixed-income and affordable housing communities. HRIC is based in New Orleans, Louisiana and is the successor entity to Historic Restoration, Incorporated ("HRI"), which was formed in 1982.

2.     Plaintiff, BCP Northshore Properties, LLC ("BCP"), is a Louisiana limited liability company domiciled at 21067 Fairhaven Road, Covington, Louisiana 70435. BCP is the current owner of the "Property," as defined below.

3.     Defendant, the St. Tammany Parish Government (the "Parish"), is a political subdivision of the State of Louisiana, located within the Eastern District of Louisiana, and governed by its Home Rule Charter, with the capacity to sue and be sued. *See* ST. TAMMANY PARISH, HOME RULE CHARTER, art. VII, § 8-01. The Parish is responsible for the acts of its agents and employee and is responsible for the enforcement of its zoning code and its ordinances. The Parish is a public entity under the Fair Housing Act and the Americans with Disabilities Act, a recipient of federal financial assistance under Section 504 of the Rehabilitation Act, and a place of public accommodation under Louisiana Revised Statutes, Title 51, Section 2232.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction of Plaintiffs' federal claims, including under 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983, 42 U.S.C. § 2000, 42 U.S.C. § 3601, 42 U.S.C. § 3613(a).

5.     Plaintiffs' claims for relief are authorized by 28 U.S.C. § 1343, the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, and Federal Rules of Civil Procedure 57 and 65.

6.     This action arises under federal statutes, including under the Fair Housing Act of 1988 as amended 42 U.S.C. § 3601, *et seq*. ("FHA"), 42 U.S.C. §§ 1981, 1982, and 1983, and the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq*., ("ADA") and Section 504 of the Rehabilitation Act of 1973, 28 U.S.C. § 794; Civil Action for Deprivation of Rights, 42 U.S.C. § 1983; and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*.

7.     Real estate developers who have contracted to purchase land, like the Developer, have standing to allege a violation of the FHA. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp*., 429 U.S. 252, 262, 97 S.Ct. 555, 562, 50 L.Ed.2d 450 (1977) (noting "despite the contingency provisions in its contract. MHDC has expended thousands of dollars on the plans for Lincoln Green and on the studies submitted to the Village in support of the petition for rezoning. Unless rezoning is granted, many of these plans and studies will be worthless even if MHDC finds another site at an equally attractive price."); *see Sunnybrook LP v. City of Alton, Illinois*, 425 F.Supp.3d 1035, 1043 (S.D. Ill. 2019) (stating "real estate developers like Sunnybrook who have contracted to purchase land have a stake in the outcome of the controversy such that they meet the requirements of constitutional standing.").

8.     BCP, as the owner of the Property, has been unduly deprived of a likely sale to the Developer because of the Parish's violations of the law.

9.     Under 28 U.S.C. § 1367, this Court has supplemental subject matter jurisdiction over Plaintiffs' state law claims because the state law and the federal law claims arise out of a common nucleus of operative facts.

4

10.    This Court has personal jurisdiction over all of the parties because all of the parties are citizens of Louisiana.

11.    Venue is proper in the Eastern District of Louisiana under 28 U.S.C. § 1391(b) because all acts complained of occurred in this district.

## FACTS

### *St. Tammany Parish's Need for Additional Housing Stock*

12.    St. Tammany Parish has a significant need for affordable housing, and, thus, is a recipient of federal Community Development Block Grant ("CDBG") funding to help combat the Parish's housing problems.

13.    To receive CDBG funds, the Parish is required to submit to the U.S. Department of Housing and Urban Development ("HUD") a "Consolidated Plan" that serves as its planning document, application for federal funds, a strategy to follow when administering HUD program funds, and an action plan for budgeting, goal setting, and performance assessment. *See* 24 C.F.R. § 91.200(c), *id*. at § 91.220(b). [2023–2027 CDBG Consolidated Plan, attached as Exhibit A.] The Consolidated Plan identifies many of the housing problems in the Parish and these problems' disproportionate impact on protected classes.

14.    The Parish's affordable housing problem is caused, in part, by being predominately zoned for single-family housing:



Residential Building Permits in St. Tammany Parish (2011 - 2021)

Source: U.S. Bureau of the Census, Residential Building Permits Survey, 2021.

[Ex. A, 2023–2027 CDBG Consolidated Plan, at p. 52.]

15.    Multifamily housing units only represent 11.7% of all Parish housing stock. [*See id*. at p. 51.]

16.    According to an August 2023 report prepared by the Parish's Department of Grants, titled St. Tammany 2023 Community Needs Assessment, the majority of households in St. Tammany are one- to two-person households:

### Household Occupancy in St. Tammany Parish (2021)

Table 6.

| # Of Occupants | Parish Total # | Parish Total % | Owner Occupied # | Owner Occupied % | Renter Occupied # | Renter Occupied % |
|---|---|---|---|---|---|---|
| 1-person | 25,421 | 24.60% | 18,341 | 22.20% | 7,080 | 33.80% |
| 2-person household | 39,118 | 37.80% | 32,932 | 39.90% | 6,186 | 29.50% |
| 3-person household | 11,947 | 11.60% | 9,679 | 11.70% | 2,288 | 10.90% |
| 4 or more-person household | 27,037 | 26.10% | 21,643 | 26.20% | 5,394 | 25.70% |

Source: U.S. Census Bureau, American Community Survey (ACS) and Puerto Rico Community Survey (PRCS), 5-Year Estimates.

[*See* St. Tammany 2023 Community Needs Assessment, p. 12, attached as Exhibit B.]

17.     As noted in the St. Tammany 2023 Community Needs Assessment report, the "housing market has not shown significant signs of keeping up with rental market demand" and this trend "should remain an important focus area when considering the current and future needs of the Parish." [*Id.* at p. 12.]

18.     The "most common housing problem within St. Tammany Parish is cost burden, affecting both homeowners and renters in the Parish. Black, American Indian, and Alaskan households are disproportionately affected by cost burden in the low- to moderate-income level groups." [Ex. A, 2023-2027 CDBG Consolidated Plan, p. 4.]

19.     Low- to moderate-income level households are those households with income levels of 80% or less of Area Median Income ("AMI"). *See* 42 U.S.C. § 1437a(b)(2)(A), Section 3 of the U.S. Housing Act of 1937 ("The term 'low-income families' means those families whose incomes do not exceed 80 per centum of the median income for the area . . . ."); *see also* 42 U.S.C. § 1437f(o)(4)(c), Section 8 of the U.S. Housing Act of 1937 (providing definitions of low-income families eligible to receive assistance); *see also* 24 C.F.R. § 570.3, Regulations Related to Housing and Urban Development, Community Development Block Grants ("Low- and moderate-income household means a household having an income equal to or less than the Section 8 low-income limit established by HUD."); *see also* Methodology for Determining FY 2023 Section 8 Income Limits, https://www.huduser.gov/portal/datasets/il//il23/IncomeLimitsMethodology-FY23.pdf ("The statutory basis for HUD's income limit policies is Section 3 of the U.S. Housing Act of 1937, as amended.").

20.     According to data from the 2021 American Community Survey, 5-year data, "[t]he median household income of St. Tammany Parish residents in 2021 (after inflation adjustment)

was $66,582, with homeowners earning a median annual income of $78,386 and renters earning $44,969." [Ex. A, 2023-2027 CDBG Consolidated Plan, p. 18.]

21. "[HUD] defines a person [as] being 'rent burdened' when their monthly rental costs exceed 30% of their monthly income. Per the University of New Orleans Institute for Economic Development and Real Estate Research's 2022 Annual Real Estate Market Analysis report, the average monthly cost of rent in St. Tammany Parish through the second quarter of 2022 is $1,875, suggesting that 86.8% of renters in St. Tammany Parish could be considered 'burdened' by their monthly rental payments." [*Id*. at p. 18.]

22. "[H]ouseholds making less than $50,000 per year are experiencing high cost burdens, while there is insufficient housing stock for the growing population of single-person households in the Parish." [*Id*. at p. 56.]

23. Low-income residents have limited affordable housing options in St. Tammany, with many areas in St. Tammany having a relatively small percentage of housing units affordable to persons who earn 30% of the AMI:



Map 1.

HUD Affordability Data

Percent Units Affordable to 30% of Area Median Family Income

- 0% - 1.4%
- 1.41% - 5.02%
- 5.03% - 8.42%
- 8.43% - 18.75%
- 18.76% - 31.31%

Source: *HUD Comprehensive Housing Affordability Strategy Data, 2022.*

[Ex. B, St. Tammany 2023 Community Needs Assessment, p. 14.]

24. "[T]he racial/ethnic demographics of St. Tammany Parish are currently 76.5% white, 13.9% black, 6.2% Hispanic, 2% Two or more races, 1.6% Asian or Pacific Islander, and 0.6% Native American." [Ex. A, 2023–2027 CDBG Consolidated Plan, p. 26.]

25. Further, "[t]he demographic makeup and economics of St. Tammany Parish are subject to some segregation according to the HUD Dissimilarity Index values (which help to identify disparities that occur along racial lines in the United States). Black/white comparisons measured at moderate segregation with a current dissimilarity trend of 43.9, whereas overall non-white/white measured at 30.8, or low segregation." [*Id*. at pp. 26–27.]

26.     At the income level 0% to 30% of AMI, "Black/African (906 households), American Indian, Alaska Natives (114 households), and Hispanics (272 households) are disproportionately affected by one or more housing problems;" "Black/African American (734 households) and American Indian, Alaska Natives (114 households) are disproportionately affected by severe housing problems;" "Black/African American (733 households) and Hispanics (246 households) are disproportionately affected by one or more housing problems;" and "Black/African American (589 households) and Hispanics (167 households) are disproportionately affected by severe housing problems." [*Id*. at pp. 33–34.]

27.     At the income level 50% to 80% of AMI, "Black/African American (772 households) are disproportionately affected by one or more housing problems;" and "Black/African American (305 households), American Indian, Alaska Natives (50 households) and Hispanics (149 households) are disproportionately affected by severe housing problems." [*Id*. at p. 34.]

28.     These housing problems are only going to get worse. "St. Tammany Parish experienced significant population growth in recent years; according to recent Census estimates, between 2020 and 2022 the population grew from 263,446 to approximately 288,859, or an increase of 9.6%." [*Id*. at p. 48.]

29.     Despite the estimated population growths, "St. Tammany Parish continues to experience a ***slow growth of multifamily units***. Twelve multifamily construction units were approved in 2019 and none have been approved in the years since. . . . [A] lack of multifamily units in the Parish may be contributing to housing burdens for [low-to-moderate income] residents." [*Id*. at p. 48. (emphasis added).]

30.     "Like many other American communities, St. Tammany has faced pushback from residents about the development of affordable housing." [*Id*. at p. 76.] While the Parish claims that

most residents who completed a community survey in 2023 expressed support for development of affordable housing, some of the comments include a desire for "less people," especially "those on public dependency." [*Id.* at p. 76.] The survey does not meaningfully represent residents of St. Tammany as only 90 people completed the survey. [*See* Ex. B, St. Tammany 2023 Community Needs Assessment, p. 55.]

31.    The City of Covington is no exception to the Parish's worsening housing trends, as zip codes in Covington are projected to have the highest percentages of growth in St. Tammany:

| Table 1. | Zip Code | 2022 Pop. | Projected 2027 Pop. | % Change |
|---|---|---|---|---|
| | 70420 – Abita Springs | 8,130 | 8,281 | 0.37% |
| | 70431 – Bush | 6,179 | 6,478 | 0.95% |
| | 70433 – Covington | 43,192 | 45,889 | 1.22% |
| | 70435 – Covington | 22,888 | 25,007 | 1.79% |
| | 70437 – Folsom | 8,106 | 8,463 | 0.87% |
| | 70445 – Lacombe | 11,048 | 11,543 | 0.88% |
| | 70447 – Madisonville | 17,699 | 18,667 | 1.07% |
| | 70471 – Mandeville | 23,042 | 23,573 | 0.46% |
| | 70448 – Mandeville | 25,905 | 26,123 | 0.17% |
| | 70452 – Pearl River | 13,383 | 13,594 | 0.31% |
| | 70458 – Slidell | 38,716 | 39,883 | 0.60% |
| | 70460 – Slidell | 22,514 | 22,604 | 0.08% |
| | 70461 – Slidell | 31,124 | 31,983 | 0.55% |
| | Source: Desire Line Population Projection based on estimates from Esri 8 U.S. Census, 2020 | | | |

[Ex. B, St. Tammany 2023 Community Needs Assessment, p. 8.]

32.    Covington is experiencing a shortage of rental housing units at all income levels, but especially for the area's low-to-moderate income households who are increasingly cost burdened. According to a market study performed by Cook, Moore, Davenport & Associates, based on a

currently outdated apartment stock, a growing population, inflation, and rising median income, the city will need to add approximately 700 units of workforce housing by 2024:

| City Demographics | **10,500**<br>City residents<br>(255,000 in the Parish) | **16%**<br>population growth<br>since 2010 | **$81,900**<br>median household<br>income in MSA |
| --- | --- | --- | --- |
| Market-rate Multifamily Market | **~900**<br>units of unmet demand<br>by 2024 | **58%**<br>of units with tenants paying<br>>30% of income on rent | **33%**<br>median gross rent as<br>% of household income |
| Downtown Rental Submarket | **$2,400**<br>Average asking rent<br>(submarket dominated<br>by single-family rentals) | **<2.0%**<br>vacancy | **~700**<br>more workforce rental<br>units needed by 2024 |

[*See* May 9, 2023 Presentation, attached as Exhibit C.]

33.    The Parish claims it "remains up to date on fair housing compliance and awareness" and its "goals and priorities include continuous on-going evaluations of the four fair housing issues identified as critical by the Department of Housing and Urban Development, including racially and ethnically concentrated areas of poverty (R/ECAPs); segregation; disparity in access to opportunity; and disproportionate housing needs." [Ex. B, St. Tammany 2023 Community Needs Assessment, p. 22; *see also* Assessment of Fair Housing, Final Report, Prepared by Asakura Robinson for the St. Tammany Parish Department of Human Services and City of Slidell Planning Department (January 4, 2018), attached as Exhibit D.]

34.    Despite claiming to be up-to-date on fair housing compliance and recognizing St. Tammany's need for affordable housing, the Parish acted to prevent the construction of an affordable, multifamily housing development in Covington.

***The Covington Trace Ridge Apartments Will Provide Low-to-Moderate Income Housing and
Permanent Supportive Housing for Persons with a Disability***

35.    The Developer plans to develop a project (the "Covington Trace Ridge Apartments" or

the "Project"), located on Lot 1, consisting of 5.328 acres located at 72147 Military Road in

Covington, Louisiana (the "Property"). An image of the proposed developed is displayed below:



[Ex. C, May 9, 2023 Presentation.]

36.    The Property is listed as HC-2 Highway Commercial on the official St. Tammany

Parish zoning map.

37.    A comprehensive plan for the unified zoning and development of lands in St. Tammany

Parish was adopted on or about September 3, 2009, by Ordinance No. 4029, Council Series No.

09-2116 (the "Comprehensive Zoning Plan"). The Comprehensive Zoning Plan was adopted in

accordance with LA. REV. STAT. § 33:106 and was based on an exhaustive two (2) year study to establish zoning classifications required for the orderly development of lands in the Parish.

38.    The zoning districts established under the Comprehensive Zoning Plan are codified as the St. Tammany Parish Unified Development Code – Volume 1, which establish uniform zoning districts that could be relied upon for future developments, traffic, drainage and maintained property values.

39.    The Parish created a HC-2 Highway Commercial District ("HC-2"), "to provide for the location of moderately scaled, more intense retail, office and service uses, generally located along major collectors and arterials designed to provide services to a portion of the parish." ST. TAMMANY PARISH, UNIFIED DEVELOPMENT CODE, art. IV, § 130-917.

40.    A permitted use of property located in HC-2 includes "Lodging, 100 rooms or less (including apartments, hotels, motels)." ST. TAMMANY PARISH, UNIFIED DEVELOPMENT CODE, art. IV, § 130-918(b)(12).

41.    Permitted uses are considered "by right" and do not require approval of the Parish's Zoning Commission, Planning Commission, or the Parish Council of St. Tammany Parish (the "Parish Council"). *Id*. at art. IV, § 130-918(a) ("Use by right subject to any minimum standards as listed in section 130-2213"); *see also id*. at art. VII, § 130-2213 (providing minimum standards for specific uses).

42.    The Developer and BCP, the owner of the land and improvements located at the Property, executed a Purchase and Sale Agreement, including amendments, regarding the Property, in which BCP has agreed to sell and the Developer has agreed to purchase all of BCP's right, title, and interest in and to the Property.

14

43.    Since early 2022, the Developer has been working with BCP, engaging with government officials, cooperating with utility providers, and seeking to ensure environmental compliance for the Project.

44.    The Project will be a high-quality, 100-unit, mixed-income and disaster-resilient community. 51% of the units target (a) low-to-moderate income housing (or workforce housing), *i.e.*, households with income levels of 80% or less of AMI and (b) permanent supportive housing ("PSH"), *i.e*., households with at least one member with a disability:



[Ex. C, May 9, 2023 Presentation.]

45.    In particular, the Project will include 44 one-bedroom units that will be occupied by households with income levels of 80% or less of AMI and 5 two-bedroom units that will be occupied by households with income levels of 80% or less of AMI.

46.    Further, the Project will include 2 one-bedroom units that will be occupied by households with at least one member with a disability.

47.    To support these housing needs, the Project will be comprised of 81 one-bedroom units and 19 two-bedroom units in three buildings that will comply with all Parish zoning requirements, including, but not limited to, requirements for setbacks, height, building size, landscaping, fill, and drainage.

48.    The Project will eliminate a blighted and underused property and provide much needed rental housing to the local workforce or low-to-moderate income households, including retail and service industry workers in the area, as well as market-rate housing, in a first-class development in a prime location:



[Ex. C, May 9, 2023 Presentation.]

49.     The Project's workforce or low-to-moderate income household units will provide high quality housing to individuals who work in Covington but are not able to find housing in Covington, the majority of whom are protected classes, including African Americans and Hispanics.

50.     On January 3, 2023, the Louisiana Office of Community Development ("OCD") awarded the Developer a Middle Market Loan Funding for the Project. [*See* January 3, 2023 Award of 2022 Middle Market Loan Funding, attached as Exhibit E.] The OCD provides funds from the United States of America, HUD Community Development Block Grant – Disaster Recovery Program ("CDBG-DR") to qualified applicants, in accordance with the State's Action Plan for Utilization of Community Development Block Grant Funds in Response to the Great Floods of 2016, as amended. The OCD awarded the Developer a CDBG-DR award pursuant to the Notice of Funding Availability and Program Implementation Guidelines for Multifamily CDBG-DR Loan Funding for the Middle Market Loan Program, published on January 14, 2022, as amended.

51.     The Developer began applying for applicable government permits in March of 2023. In particular, on March 8, 2023, the Developer submitted applications for a Land Clearing Permit and a Demolition Permit. Subsequently, on April 5, 2023, the Developer applied for a permit to convert its lot from 3 subdivisions into a single lot. Lastly, in May of 2023, the Developer applied for applicable building permits.

52.     Based on the HC-2 Highway Commercial zoning and guidance from the St. Tammany Planning and Permits Department, the Developer has incurred approximately $2 million on land acquisition costs, legal fees, development fees, consulting and professional service fees, government agencies permits and fees, engineering and design fees, and management fees (the "Developer's Investment").

53.    Prior to the recent events that are the subject of this litigation, construction on the Project was scheduled to begin in July 2023 and to be completed by September 2024.

### *The Parish's Moratorium on Construction of New Multifamily Buildings*

54.    In 2023, the Parish considered or adopted ordinances to impose a moratorium on rezoning and/or permitting for the construction of multifamily buildings in Districts 1 and 2 of St. Tammany Parish, Ord. Cal. No. 7254, Ord. Cal. No. 7254AA, and Ord. Cal. No. 7440 (For simplicity, these ordinances will also be referred to collectively as the "Moratorium Ordinance.")

55.    On May 4, 2023, the Parish Council introduced the Moratorium Ordinance, Ord. Cal. No. 7254, an ordinance to impose a moratorium on rezoning and/or permitting for the construction of multifamily buildings in Districts 1 and 2, Wards 1, 2, and 3, specifically to property zoned for multifamily residences, A-6, A-7, A-8.

56.    The Moratorium Ordinance introduced on May 4, 2023, Ord. Cal. No. 7254, did not apply to property zoned as Highway Commercial or "HC."

57.    At a meeting held in the Parish President's office on May 9, 2023, the Developer presented the Project to several government officials, including Councilman David R. Fitzgerald, Parish President Michael B. Cooper, the Chief Administrative Officer for the City of Covington, and a representative of OCD.

58.    At the May 9, 2023 meeting, Councilman Fitzgerald claimed he first learned of the Project and had not been consulted about the Project. Councilman Fitzgerald expressed outrage at the Parish President for letting the project proceed to a "done deal level" without either the Administration or representatives of the Developer consulting him sooner.

59. Councilman Fitzgerald, using an aggressive tone and demeanor, asked about the type of residents who would live at the apartments. When learning that the apartments would be occupied by mixed-income residents, Councilman Fitzgerald stated that his constituents would "hate" the Project and be very upset with him if it got built. Councilman Fitzgerald stated that he did not want Section 8 housing, as provided by the Project. It was clear that Councilman Fitzgerald's concern was that apartments that served lower income people were being built on Military Road in his district and that affluent neighborhoods who lived nearby would attack him if the Project was able to proceed, particularly in the election year when Mr. Fitzgerald sought re-election in the Fall of 2023.

60. Following the May 9, 2023 meeting, the Parish Council prepared an ordinance to amend its proposed Moratorium Ordinance to include the zoning district in which the Project is located. Indeed, in a Parish Council newsletter (distributed via e-mail on July 14, 2023), the Parish Council admitted that its intent in the amended moratorium was to stop the development of the Project:

> After the District 1 and 2 multifamily moratorium was introduced by the Council in May, a meeting was held with District 2 Councilman David Fitzgerald, to unveil the Covington Trace Ridge Apartments development. The Councilman was informed that the multifamily moratorium introduced in this district would not apply to this development because of the highway commercial zoning in place at the proposed site. The Council therefore amended its multifamily moratorium to include highway commercial zoning classifications at a meeting on May 17th and adopted the moratorium on June 1st.

[*See* July 14, 2023 Newsletter, attached as Exhibit F (emphasis added).]

61. Additionally, following the May 9, 2023 meeting, the Parish Council prepared a resolution to "investigate" the Parish President for allowing the Project; specifically, the Parish Council prepared Resolution Council Series No. C-6775, a "resolution to convene an investigation and review into the manner in which the proposed Covington Trace Ridge Apartments has been

processed." (the "Investigation Resolution"). [*See* Investigation Resolution, attached as Exhibit G.]

62.    The Investigation Resolution was prepared and introduced as a political device to attack the Parish President and to encourage residents, particularly affluent residents, to express opposition to an apartment complex that would primarily serve low-to-moderate income residents.

63.    On May 18, 2023, before the Parish Council's meeting that day, representatives of the Developer met with government officials, including Councilman Fitzgerald and representatives of the Parish's District Attorney's Office, including Terry Hand, Carey Menard and Emily Couvillon, to discuss the Project. In that meeting, Councilman Fitzgerald again expressed his opposition to the Project, stating the best use of the site would be a dog park. Mr. Hand also stated that residents have been notified of the Project and that the Developer should anticipate community opposition. None of the comments by government officials addressed the City of Covington's and/or St. Tammany Parish's need for workforce or low-to-moderate income housing.

64.    At the Parish Council's meeting on May 18, 2023, the Parish Council introduced an amended version of the Moratorium Ordinance, Ord. Cal. No. 7254AA, which amended the May 4, 2023 introduced version, and added the language "or Highway Commercial Zoning Classifications with Lodging (including apartments, hotels, and motels)," language that was *not* included in the May 4, 2023 introduced version, Ord. Cal. No. 7254. [*See* Ord. Cal. No. 7254AA, attached as Exhibit H.] A video of the Parish Council's May 18, 2023 meeting is available at https://www.youtube.com/watch?v=RdMxz8VDtV4&list=PLH9u5rn0HS1fI0QIFY9idTmumZw xPHv4Z&index=13.

65.    The Moratorium Ordinance, Ord. Cal. No. 7254AA, did not include *all* zoning or overlay classifications that allow apartment projects, such as the zoning classification Planned

Business Campus or the overlay classification Planned United Development, *see generally* ST. TAMMANY PARISH, UNIFIED DEVELOPMENT CODE, art. IV, § 130-839 (PBC-1 Planned Business Campus), *id*. at § 130-863 (PBC-2 Planned Business Campus), *id*. at § 130-1672.

66. The Moratorium Ordinance, Ord. Cal. No. 7254AA was clearly targeted and retaliatory, specifically aimed to stop the Project, and in particular, to keep out workforce or low-to-moderate income residents, who are mostly African American and Hispanics, in the affluent neighborhood adjacent to the Property.

67. On May 24, 2023, the Developer, through its agent, received a Demolition Permit, 2023-1124 (which was applied for on March 8, 2023).

68. On May 31, 2023, the OCD issued a public notice of Finding of No Significant Impact ("FONSI"), determining that the project will have no significant impact on the human or natural environment:

> Notice Issued: May 31, 2023
> This notice shall satisfy two separate but related procedural requirements for activities to be undertaken by the Office of Community Development.
> REQUEST FOR RELEASE OF FUNDS
> On or about June 16, 2023, the Louisiana Office of Community Development (OCD) will submit a request to the U.S. Department of Housing and Urban Development (HUD) for the release of funds appropriated by the Continuing Appropriations Act, 2017 (Public Law 114-223) published in the Federal Register on November 21, 2016, for the purpose of the Covington Trace Ridge Apartments Project. St. Tammany Parish and surrounding areas were impacted by significant flooding in 2016 resulting in a shortage of housing. The purpose of the project is to provide multi-family residential rental properties to address the long-term need as a result of the 2016 Floods. The project proposes development of a new 100-unit multi-family housing community. Amenities will include a pool deck, a community lounge, a fitness center, and associated parking and landscaping. The multi-family buildings include a total of 100 units comprised of two building types multi-family and townhomes. The estimated HUD CDBG funding is $18,300,000.00. Estimated total project cost is $34,300,000.00. The location of the proposed activities is at 72147 Military Road in Covington, St. Tammany Parish, LA 70435.
> FINDING OF NO SIGNIFICANT IMPACT
> The OCD has determined that the project will have no significant impact on the human or natural environment. Therefore, an Environmental Impact Statement under the National Environmental Policy Act of 1969 (NEPA) is not required. Additional project information is contained in the Environmental Review Record (ERR) on file at the OCD office at 617 N. Third Street, Baton Rouge, Louisiana and may be examined weekdays between 8:00 am to 4:00 pm. The ERR can be made available to the public for review electronically. Please submit your request by emailing Murilo Martins at Murilo.Martins@LA.GOV or calling (225) 219-0098.

[*See* May 31, 2023 FONSI, attached as Exhibit I (emphasis added).]

69. On May 31, 2023, the Moratorium Ordinance, Ord. Cal. No. 7254AA, was republished.

70. On June 1, 2023, the Developer, through its agent, received a Land Clearing Permit, 2023-11024.

71. In a memorandum received by a representative of the Developer on June 1, 2023, Ross Liner, Director of the Department of Planning & Development of the St. Tammany Parish Government, confirmed to the Developer the following permittable uses of the Property:



ST. TAMMANY PARISH
MICHAEL B. COOPER
PARISH PRESIDENT

**DEPARTMENT OF PLANNING AND DEVELOPMENT**

Re: Lot 1 (5.328 Acres) at 72147 Military Road

Dear Mr. Schoen,

As per your request of Lot 1 (5.328 Acres) at 72147 Military Road this memo will verify the allowable uses under the HC-2 Highway Commercial zoning district, Chapter 130, Article IV, Division 25 of the St. Tammany Parish Unified Development Code (Council Ordinance 10-2234).

1. Lot 1 (5.328 Acres) at 72147 Military Road is listed as HC-2 Highway Commercial (Council Ordinance 10-2234) on the official St. Tammany Parish zoning map.
2. As per Sec. 130-918(b)(12), "Lodging, 100 rooms or less (including apartments, hotels, motels)" is a permitted use within the HC-2 Highway Commercial District zoning classification (latest revision Council Ordinance 11-2532). Previous apartment/multi-family developments in St. Tammany Parish, rooms have been interpreted as individual units.
3. Lot 1 (5.328 Acres) at 72147 Military Road appears to have been classified HC-2 Highway Commercial in 2010 (Council Ordinance 10-2234).

Permitted uses listed in Sec. 130-918. - Permitted uses; are considered "by right" and do not require Zoning Commission, Planning Commission, or Parish Council approval. If all aspects of site design criteria, state and federal agency approvals, and payments meet ordinance a permit will be granted, should a variance be needed application to and a public hearing in front of the Board of Adjustments will be required before a permit is issued.

Please don't hesitate to contact my office for further assistance in this matter, or otherwise.

Sincerely,

Ross Liner, AICP, PTP, CFM

[June 1, 2023 Letter of Ross Liner, attached as Exhibit J (emphasis added).]

72.    Furthermore, at least two apartment complexes are located in Highway Commercial zones: (1) Artesia Apartments (8382 Westshore Dr., Covington) - HC-3 zoning, 264 apartments, built in 2017 and (2) The Fairlane (101 Holiday Square Blvd., Covington) - HC-3 zoning, 86 units, converted from a hotel into apartments in 2022.

73.    On June 1, 2023, the Parish Council considered the Moratorium Ordinance, Ord. Cal. No. 7254AA and the Investigation Resolution, Resolution Council Series No. C-6775.  A video of the Parish Council's June 1, 2023 meeting is available at https://www.youtube.com/ watch?v=xiC8sw_t5bk&list=PLH9u5rn0HS1fI0QIFY9idTmumZwxPHv4Z&index=12.

74.    Ord. Cal. No. 7254AA provided, in pertinent part:

ORDINANCE TO IMPOSE A SIX (6) MONTH MORATORIUM ON RECEIPT OF SUBMISSIONS BY THE PARISH ZONING COMMISSION FOR THE REZONING OF MULTI-FAMILY PROPERTY AND/OR ON THE ISSUANCE OF CERTAIN PERMITS BY THE PARISH DEPARTMENT OF PLANNING AND DEVELOPMENT/PERMITS FOR THE CONSTRUCTION OR PLACEMENT OF NEW MULTI-FAMILY BUILDING STRUCTURES ON PROPERTY ZONED A-6, A-7, A-8, OR HIGHWAY COMMERCIAL ZONING CLASSIFICATIONS WITH LODGING (INCLUDING APARTMENTS, HOTELS, MOTELS) IN WARDS 1, 2, AND 3, DISTRICTS 1 AND 2.

[Ex. H, Ord. Cal. No. 7254AA.]

75.    At the June 1, 2023 meeting, Councilman Fitzgerald spoke against the Project and in favor of the Investigation Resolution. Standing up while speaking, Councilman Fitzgerald called the Project "mysterious," stating he found out about the Project on May 9, 2023 and that he wanted to find out how the Project so easily progressed. With a raised tone, Councilman Fitzgerald claimed that the Parish President stated in a couple of conversations that he is not an advocate of the Project

23

and that, in response, Councilman Fitzgerald would ask, "then if you're not, who is?" Members of the audience cheered Councilman Fitzgerald statement.

76.     At the June 1, 2023 meeting, residents spoke out against the Project. One resident called the Parish "really out of control in many different ways," and further added he was "not an advocate at all of government subsidized housing." Another resident, speaking for his homeowner's association, stated they were "strictly against" the Project and stated that it was the Parish Council's "job to stop it and keep it from going any further." Another resident called the Project a "comedy of errors" that "affects the very lives of the citizens of this particular Parish," and requested the Parish Council think about "100 rooms when you think about apartments." Members of the audience applauded enthusiastically at numerous times during the comments.

77.     Several residents who spoke out against the Project's effect on traffic, flooding, and the environment, although these comments lacked support and were unfounded. The Developer has worked diligently with government officials, including filing necessary paperwork and applications with permitting departments, and has been responsive to the Parish's Planning and Engineering staff during the course of the development of the Project.

78.     At the June 1, 2023 meeting, the CEO for the Developer was given three minutes to speak. During that brief presentation, the CEO of the Developer, Mr. A Thomas Leonhard, Jr., defended the merits of the Project, including complementing the planning, engineering and permit staff for working constructively to ensure the Project design fits all of laws and legal requirements. Mr. Leonhard also stated he opposed the Investigation Resolution, which wrongly suggested some sort of back-door or nefarious deal led to the Project, all of which is unwarranted and untrue.  Mr. Leonhard stated his company has played by the rules and that the Project will be the "finest apartment building in St. Tammany," which resulted in members of the audience laughing.

79. At the June 1, 2023 regular meeting, the Moratorium Ordinance, Ord. Cal. No. 7254AA, was declared adopted.

80. Also at the June 1, 2023 Parish Council regular meeting, the Parish Council adopted the Investigation Resolution, Resolution Council Series No. C-6775.

81. The stated purpose of the Moratorium Ordinance—namely, that population growth has outpaced improvements to traffic and drainage infrastructure—is pretextual. As noted above, OCD issued a public notice determining that the Project will have *no* significant impact on the human or natural environment.

82. Further, the Parish has not explained what traffic and drainage infrastructure issues necessitated a Moratorium Ordinance applicable to Plaintiffs' Property and Project. Indeed, the language of the Moratorium Ordinance introduced at the Parish Council's May 4, 2023 meeting did *not* apply to Plaintiffs' Property and Project. Only 14 days later, on May 18, 2023, the Parish Council introduced an amended version of the Moratorium Ordinance, Ord. Cal. No. 7254AA, which amended the May 4, 2023 introduced version, and added the language "or Highway Commercial Zoning Classifications with Lodging (including apartments, hotels, and motels)." The Parish has not provided any explanation for what traffic and drainage infrastructure issues were identified during those 14 days that necessitated expanding the scope of the Moratorium Ordinance to include Plaintiffs' Property and Project.

83. Additionally, concerns about traffic and drainage infrastructure apply equally to single-family developments as they do to multifamily developments, and such concerns would have been (successfully) addressed by the Developer before receiving the three requested (and still outstanding) permits.

84.     On June 5, 2023, the Developer, through its agent, received a Building Permit, 2023-2319.

85.     On June 8, 2023, the Parish President signed the Moratorium Ordinance, Ord. Cal. No. 7254AA, and, as a result, it was "finally enacted." *See* ST. TAMMANY PARISH GOVERNMENT, HOME RULE CHARTER, art. I, § 2-13(B); *id*. at § 2-12(C).

86.     On June 9, 2023, the Chair of the Parish Council sent a letter on behalf of the Parish Council to OCD objecting to its FONSI to the Developer, claiming it received inadequate notice and a lack of information. According to the letter, the Parish Council received information that conditions at the site of the proposed project are "less than ideal," claiming fill will be required and soil borings on the site show evidence of various contaminants. The letter did not identify or attach any evidence supporting its assertions regarding environmental conditions of the site.

87.     The Developer has applied for, but has not received, the following building permits: Construction Phase 1 Building Permit for a structure referred to as "Building B" (2023-2129), Construction Phase 2 Building Permit for a structure referred to as "Building A" (2023-2130), and Construction Phase 3 Building Permit for a structure referred to as "Townhomes." (2023-2131).

88.     On June 30, 2023, the Developer filed suit against the Parish in Louisiana State Court, the 22nd Judicial District Court, seeking a judgment declaring that the Moratorium Ordinance is null and void under state law and/or a judgment declaring that the Developer's Project is exempt from the Moratorium Ordinance, in the matter titled *Military Road Revitalization Company, LLC v. St. Tammany Parish Government*, pending before the Honorable William H. Burris, 22nd Judicial District Court, Division "E," Case No. 2023-13320 (the "State Litigation"). The State Court Suit did not assert the federal claims alleged in this Complaint.

89.     At its regular monthly Council meeting on July 13, 2023, the Parish Council introduced an ordinance to amend the Parish's Unified Development Code to remove the word "apartments" as a permitted use by right in certain zoning classifications, including HC-2.

90.     On September 18, 2023, the district judge in the State Litigation conducted a hearing on the Developer's request for a preliminary injunction (based on violations of state law) and denied the Developer's request, which is currently the subject of a supervisory writ application with the Louisiana First Circuit Court of Appeal.

91.     On November 2, 2023, the Parish Council introduced Ord. Cal. No. 7440, a proposed ordinance to extend the Moratorium Ordinance, Ord. Cal. No. 7254AA, for an additional six months. Ord. Cal. No. 7440 includes the same "exemption" language as provided in Ord. Cal. No. 7254AA.

92.     On December 7, 2023, the Parish Council adopted Ord. Cal. No. 7440 and extended the Moratorium Ordinance, which continued its ban on the proposed construction of the Project by the Developer at the Property. A video of the Parish Council's December 7, 2023 meeting is available at https://www.youtube.com/watch?v=MWUuxOlDwsM&list=PLH9u5rn0HS1fI0 QIFY9idTmumZwxPHv4Z&index=1&t=12119s.

93.     Also on December 7, 2023, the Parish Council considered Ord. Cal. No. 7465, an ordinance to rename and reorganize the Unified Development Code. Among other changes, a renamed and reorganized Unified Development Code would remove the word "apartments" as a permitted use in certain zoned property, including property zoned HC-2.

94.     With respect to the considered changes to the Unified Development Code, at the December 7, 2023 meeting, the Parish Council also amended and re-introduced an amendment

that exempted the Property from the changes to the Unified Development Code, which will be considered for adoption at the January 11, 2024 Parish Council Meeting.

95.    During the Parish Council's discussion of an amendment that exempted the Property from changes to the Unified Development Code, Mr. Liner, Director of the Department of Planning & Development, represented that the Project is the only current development of apartments and could not identify any other developments of apartments in St. Tammany.

### *The Parish Rejects A Resolution to Resolve Litigation Against the Developer*

96.    On December 18, 2023, the Parish Council considered a resolution, sponsored by the Parish President and Chair of the Parish Council, Resolution Council Series No. C-6859, to resolve the State Litigation between the Developer and the Parish. [*See* Resolution Council Series No. C-6859, attached as Exhibit K.]

97.    Resolution Council Series No. C-6859 would have (a) authorized the Parish President to negotiate and execute a consent judgment and settlement and release agreement, (b) vacated, in part, the Moratorium Ordinance to exclude the Project, and (c) authorized the Parish President to apply CDBG funds for the development of the Project.

98.    Resolution Council Series No. C-6859 noted that the Developer had shared a draft federal complaint to allege, among other allegations, violations of the FHA and the ADA. Resolution Council Series No. C-6859 noted that:

> WHEREAS, St. Tammany Parish Administration and the St. Tammany Parish Council believe it is in the best interest of St. Tammany Parish Government to resolve amicably the claims asserted or that could have been brought in the State Litigation and Federal Litigation (a) to avoid continued and protracted litigation and (b) in light of the Louisiana Office of Community Development's determination that the Project will have no significant impact on the human or natural environment.

[Ex. K, Resolution Council Series No. C-6859.]

99. At the December 18, 2023 meeting, at which the Parish Council considered Resolution Council Series No. C-6859, five councilmembers voted in favor of the resolution.

100. The five councilmembers who voted in favor of Resolution Council Series No. C-6859 agreed that it was in the best interest of the Parish to resolve amicably the claims asserted and could have been asserted by the Developer.

101. The five councilmembers who voted in favor of Resolution Council Series No. C-6859 agreed that it was in the Parish's best interest to resolve litigation asserted by Developer in light of the Developer's shared draft of a federal complaint alleging violations of the FHA and the ADA.

102. The five councilmembers who voted in favor of Resolution Council Series No. C-6859 agreed that it was in the Parish's best interest to resolve litigation asserted by the Developer "in light of the Louisiana Office of Community Development's determination that the Project will have no significant impact on the human or natural environment."

103. The councilmembers who voted against Resolution Council Series No. C-6859 did not state why they did not believe the Parish did not violate the FHA or the ADA.

104. The councilmembers who voted against Resolution Council Series No. C-6859 did not state why they disagree with the "Louisiana Office of Community Development's determination that the Project will have no significant impact on the human or natural environment."

105. Councilman Fitzgerald, who voted against Resolution Council Series No. C-6859, baselessly alleged that "money" was the force behind the Project. A video of the December 18, 2023 meeting is viewable at https://www.youtube.com/watch?v=Z6RqWrKUybs&t=9523s.

106. Councilman Fitzgerald also complained that no private entity, without assistance, could develop the Project, stating:

This Project I have no doubt would be erected at very great cost to us, at very great cost to us, in terms of, in perpetuity, as this thing develops over 10 years, and the clients walk away, the developers walk away. And it also just in pure dollars and cents, where does the $20 million bucks come from to kick start this project. Well, from us, its tax dollars. You know, we're paying for pain. Why hadn't a private entity developed this 5-acres? Why? Because nobody can make a dime on it. Because it's the wrong location. Because there will be people lined up around this building against it. No private developer can combat that. But when you got $ 20 million bucks up front, you're pretty solid. You got the carrot. And you got the stick. If anybody objects, now we're going to federal court. This isn't extortion, this isn't a threat, this is just something for you to think about. We're going to go to federal court and we're going to say that you have discriminatory practices. It really doesn't matter if you do or not. That's what we're going to say. And we're going to find a judge on board that likes that comment and we're going to cram it down your throat. Get used to it.

107. Further explaining his reasons for objecting to the Project, Councilman Fitzgerald stated that he viewed a federal suit as "Federal government overreach. Usurping our local politics . . . to the maximum. And the principles walk away with money."

108. Councilman Fitzgerald also questioned the motives of the Administration in backing the Project, stating:

> Who's for this? The landowner. Why? Money. The realtor. Why? Money. The developer. Why? Money. The Administration? Yeah, it begs, doesn't it. The question begs to be asked. And I don't mean any underhanded briefcase in the back of a suburban. I mean, who are going to be the contractors here? Who's going to benefit? Who's going to benefit from this project, $35 million dollars. Well that will be interesting to see as it plays out. But I certainly don't want any part of greenlighting this.

109. Councilman Fitzgerald also stated that he stands by his constituents and he could not find anyone for the Project.

110. Councilman Fitzgerald directed his most scornful remarks at HUD, stating:

> I don't appreciate the bully pulpit from HUD and its representatives. And that's what it is. Its going on . . . its all over the country. And if you say one remark or anyone says one remark, watch out. We're going to smush you like a little bug because we got the money and we got the Feds. And we really don't give a damn what you think.

111. The Parish's actions in blocking the development of the Project has a disparate impact on protected classes, including African Americans, Hispanics, and persons with disabilities, in St. Tammany Parish.

112. The Parish's tacit endorsement of the discriminatory sentiments espoused by opponents of the Covington Trace Ridge Apartment, including representatives on the Parish Council, has the intent and effect of retaliating against Plaintiffs for proposing an affordable housing complex in Covington and in chilling Plaintiffs and others from proposing similar developments in the future.

113. Due to the Moratorium Ordinance, Plaintiffs cannot seek or obtain necessary permits, and cannot start work on the Project.

114. The Moratorium Ordinance injures Plaintiffs because the delay in the Project risks stopping the Project, whether due to increased interest rates, increased costs, lost funding, or any other event that results in the Project becoming cost-prohibitive.

115. In addition to the injuries Plaintiffs have suffered, the Parish's actions have had and continue to have the purpose and effect of limiting housing opportunities for protected classes, including African Americans, Hispanics, and persons with disabilities, that would live in the Covington Trace Ridge Apartments.

116. The Parish's actions have the purpose and effect of perpetuating racial segregation in housing in Covington because those actions will prevent protected classes, including African

31

Americans, Hispanics, and persons with disabilities, from the surrounding areas from moving into the area.

117. The Parish's actions constitute unlawful interference with housing opportunities on the basis of race or disability.

118. Through the actions described in this Complaint, the Parish has acted intentionally, maliciously, and with willful, malicious, wanton, and reckless disregard for federal and state fair-housing and non-discrimination laws.

119. As a proximate result of the actions and practices described above, Plaintiffs have suffered, and will continue to suffer, great injury in the future, including, but not limited to, economic losses and the deprivation of the right to develop affordable housing for individuals free from discrimination on the basis of race or disability.

## CLAIMS

### *Count 1: Fair Housing Act, 42 U.S.C. § 3604 and 42 U.S.C. § 3617*

120. Plaintiffs incorporate and re-allege as though set out in full herein the allegations contained in the foregoing paragraphs.

121. The Parish's discriminatory Moratorium Ordinance and repeated refusal to fully permit the development and construction of the Project violate the FHA, 42 U.S.C. § 3601, *et seq*. and its implementing regulations at 24 C.F.R. Part 100.

122. The FHA "prohibits discrimination in the rental or sale of a dwelling based on certain protected characteristics." *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co*., 920 F.3d 890, 900 (5th Cir. 2019).

123. The statute reflects "the policy of the United States to provide within constitutional limitations, for fair housing throughout the United States." *Id*. at 900–01 (citing 42 U.S.C. § 3604).

124. "The FHA, as originally enacted in 1968, prohibited discrimination based on race, color, religion, or national origin." *City of Edmonds v. Oxford House, Inc*., 514 U.S. 725, 728 n.1, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995).

125. "In 1988, Congress extended coverage to persons with handicaps and also prohibited 'familial status' discrimination, *i.e*., discrimination against parents or other custodial persons domiciled with children under the age of 18." *Id*. (citing 42 U.S.C. § 3602(k)).

### *Discriminatory Intent*

126. Discriminatory intent may be demonstrated through direct or circumstantial evidence. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp*., 429 U.S. 252, 262, 97 S.Ct. 555, 562, 50 L.Ed.2d 450 (1977).

127. The United States Supreme Court and the U.S. Fifth Circuit outlined the following non-exhaustive list of circumstantial evidence factors that may be probative of a government entity's discriminatory intent: "(1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history. . . ." *Overton v. City of Austin*, 871 F.2d 529, 540 (5th Cir. 1989) (citing *Arlington Heights*, 429 U.S. at 267–68).

128. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. Courts have acknowledged that direct evidence of discrimination is especially unlikely to be forthcoming in cases involving the racial motivation of

33

public officials. *See*, *e.g*., *Smith v. Town of Clarkton, N.C*., 682 F.2d 1055, 1064 (4th Cir. 1982) (stating "[m]unicipal officials acting in their official capacities seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority."); *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977) ("As overtly bigoted behavior has become more unfashionable, evidence of intent has become harder to find."); *see also Mhany Mgmt., Inc. v. Cnty. of Nassau,* 819 F.3d 581, 608–10 (2nd Cir. 2016) (upholding district court's finding that references to maintaining the "flavor" and "character" of a city were "code words for racial animus.").

129.  It is well established that government entities can be held liable for capitulating to the discriminatory motives of their constituents, regardless of whether public officials explicitly endorse or personally agree with those motives. *See*, *e.g*., *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 580 (2d Cir. 2003) (upholding district court's finding of intentional discrimination based, in part, on the history of hostility of neighborhood residents and their pressure on the Mayor and other city officials); *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 49 (2d Cir. 1997) (noting that a city "may not base its decisions on the perceived harm from stereotypes and generalized fears" and "a decision made in the context of strong, discriminatory opposition becomes tainted with discriminatory intent even if the decisionmakers personally have no strong views on the matter."), *recognized as superseded on other grounds by Zervos v. Verizon New York, Inc*., 252 F.3d 163, 171 n.7 (2d Cir. 2001); *United States v. Yonkers Bd. of Educ*., 837 F.2d 1181, 1124 (2nd Cir. 1987) (noting "[t]he Supreme Court has long held, in a variety of circumstances, that a governmental body may not escape liability . . . merely because its discriminatory action was undertaken in response to the desires of a majority of its citizens."); *Smith v. Town of Clarkton, N.C*., 682 F.2d 1055, 1066 (4th Cir. 1982) (affirming district court's finding that Town acted with

discriminatory intent when it halted development of public housing in response to racially motivated opposition by residents); *United States v. City of Black Jack, Mo*., 508 F.2d 1179, 1185, n. 3 (8th Cir. 1974) (Eighth Circuit agreeing with Tenth Circuit's opinion that "it is enough for the complaining parties to show that the local officials are effectuating the discriminatory designs of private individuals.") (internal citations omitted); *Jim Sowell Constr. Co., Inc. v. City of Coppell*, 61 F. Supp. 2d 542, 551 (N.D. Tex. 1999) ("[C]itizen comments can demonstrate that public officials acted with bias" where "the circumstances surrounding those statements strongly suggest that the public officials either adopted the citizens' biases or acted directly in response to citizens' discriminatory desires.").

130. HUD regulations provide liability for discriminatory housing practices based on a "person's own conduct" and "where the person knew or should have known of the discriminatory conduct." 24 C.F.R. § 100.7(a)(1)(i)–(iii).

### *Discriminatory Effect*

131. "Moratoriums and other zoning practices are actionable under the FHA and the ADA when they have a discriminatory effect on a protected class." *U.S. v. City of New Orleans*, No. 12-2011 (E.D. La. 04/24/2013), 2013 WL 1767787 at *6.

132. The United States Supreme Court has expressly held that a plaintiff can assert a "disparate-impact" claim under the FHA. *See Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc*., 576 U.S. 519, 135 S.Ct. 2507, 2510, 192 L.Ed.2d 514 (U.S. 2015).

133. Among other things, the FHA's provisions prohibiting discriminatory housing practices proscribe "zoning laws and other housing restrictions that function unfairly to exclude minorities from certain neighborhoods without any sufficient justification." *Id*. at 539. "Suits

targeting such practices[,]" including restrictions on multifamily rental housing, "reside at the heartland of disparate-impact liability." *Id*. at 539–40 (citing *Town of Huntington, N.Y. v. Huntington Branch, N.A.A.C.P*., 488 U.S. 15, 16–18 (1988) (per curiam) (invalidating zoning law preventing construction of multifamily rental units); *United States v. City of Black Jack, Mo*., 508 F.2d 1179, 1182–88 (8th Cir. 1974) (invalidating ordinance prohibiting construction of new multifamily dwellings).

134.  HUD regulations provide that "[a] practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.500(a). A plaintiff has the initial "burden of proving that a challenged practice caused or predictably will cause a discriminatory effect." 24 C.F.R. § 100(c)(1). Once the plaintiff satisfies this initial requirement, the burden shifts to the defendant who must "prov[e] that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the [] defendant." 24 C.F.R. § 100(c)(2).

### *The Moratorium Ordinance Discriminates on the Basis of Race*

135.  The Moratorium Ordinance and related efforts to block the Developer's Project were undertaken with the intent and purpose of making unavailable and denying persons rental housing because of race in violation of the FHA, 42 U.S.C. § 3604(a), which states that it is unlawful to "make unavailable or deny a dwelling to any person because of race . . . ."

136.  The Project will include 44 one-bedroom units that will be occupied by households with income levels of 80% or less of AMI and 5 two-bedroom units that will be occupied by households with income levels of 80% or less of AMI.

137.  As recognized by this Court in a similar FHA dispute that arose in St. Bernard Parish, a moratorium that reduces the supply of rental properties can have a disparate racial impact on protected classes, including African Americans. *See Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Par.*, 641 F.Supp.2d 563, 567 (E.D. La. 2009) (relying on statistical evidence to establish a moratorium ordinance that affected rental properties would have a disparate racial impact).

138.  By interfering with the development of the Project and preventing housing stock that would bring protected classes to Covington, including African Americans and Hispanics, the Parish's actions perpetuate and reinforce patterns of segregation in St. Tammany Parish.

139.  Indeed, according to St. Tammany Parish's Consolidated Plan, the Project will be constructed in an area with a higher percentage of non-white and foreign-born protected classes:

---

**Are any of those racial or ethnic groups located in specific areas or neighborhoods in your community?**

The following census tracts have a higher percentage of non-white and foreign-born protected classes, and have the highest exposure to poverty within St. Tammany Parish:

- 405.01
- 407.04
- 411.03
- 412.02

Neighborhoods include the West 30's, Covington Trace Bridge Apartments, Browns Village Road area of Slidell, and the HWY 433/HWY190 area of Slidell.

---

[Ex. A, 2023–2027 CDBG Consolidated Plan, p. 34.]

140.  The St. Tammany Parish's Consolidated Plan identified the "Covington Trace Bridge [sic] Apartments" as located in a neighborhood with a higher percentage of non-white and foreign-born protected classes, further demonstrating that the Parish recognizes the need for the development of the Covington Trace Ridge Apartments.

141.  As the Project's workforce or low-to-moderate income units will provide high quality housing to individuals who work in Covington but are not able to find housing in Covington, the majority of whom are protected classes (including African Americans and Hispanics), the discriminatory effect of the Moratorium Ordinance cannot be denied. *See Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Par.*, 641 F.Supp.2d 563, 567 (E.D. La. 2009).

142. A review of the events leading up to the adoption of the Moratorium Ordinance supports a finding that it was adopted with discriminatory intent and would have a discriminatory effect. Among other events, as alleged above, on May 9, 2023, at a meeting between representative of the Developer and government officials, Councilman Fitzgerald specifically asked what type of residents would live in the Project, stating that he did not want Section 8 housing, as provided by the Project. On May 18, 2023, the amended Moratorium Ordinance added language to specifically target the Project. The intent of the Moratorium Ordinance was to prevent the development of apartments that would serve low-to-moderate income residents, which has the effect of racial discrimination. *See Greater New Orleans Fair Housing Action Center v. St. Bernard Parish*, 641 F.Supp. 2d 563 (E.D. La. 2009) (Holding parish government's moratorium ordinance violated FHA in part, based on comments regarding low-income housing that were determined to have racial discriminatory intent and evidence of a disparate racial effect).

143.  The Moratorium Ordinance and related efforts to block the Developer's Project violates the FHA because these government actions prohibit the development of a construction that will include rental properties for protected classes.

### *The Moratorium Ordinance Discriminates on the Basis of Disabilities*

144.  The Moratorium Ordinance and related efforts to block the Developer's Project were undertaken with the intent and purpose of making unavailable and denying persons rental housing

because of disabilities, in violation of the FHA, 42 U.S.C. § 3604(f)(1), which states that it is unlawful to discriminate "against any person in the terms, conditions, or privileges of sale or rental of dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap . . . ." 42 U.S.C. § 3604(f)(1).

145.  The Project will include 2 one-bedroom units that will be occupied by households with at least one member with a disability.

146.  Under the FHA, a handicap is defined as "(1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such impairment, or (3) being regarded as having such an impairment." 42 U.S.C. § 3602(h).

147.  The Moratorium Ordinance and related efforts to block the Developer's Project violates the FHA because these government actions prohibit the development of a construction that will include rental properties for persons with disabilities.

### *The Parish's Actions Lack a Legitimate Justification and Injure Plaintiffs*

148.  The stated purpose of the Moratorium Ordinance—namely, that population growth has outpaced improvements to traffic and drainage infrastructure—is pretextual. As noted above, OCD issued a public notice determining that the Project will have *no* significant impact on the human or natural environment.

149.  Further, the Parish has not explained what traffic and drainage infrastructure issues necessitated a Moratorium Ordinance applicable to Plaintiffs' Property and Project. Indeed, the language of the Moratorium Ordinance introduced at the Parish Council's May 4, 2023 meeting did *not* apply to Plaintiffs' Property and Project. Only 14 days later, on May 18, 2023, the Parish Council introduced an amended version of the Moratorium Ordinance, Ord. Cal. No. 7254AA,

which amended the May 4, 2023 introduced version, and added the language "or Highway Commercial Zoning Classifications with Lodging (including apartments, hotels, and motels)." The Parish has not provided any explanation for what traffic and drainage infrastructure issues were identified during those 14 days that necessitated expanding the scope of the Moratorium Ordinance to include Plaintiffs' Property and Project.

150. Additionally, concerns about traffic and drainage infrastructure apply equally to single-family developments as they do to multifamily developments, and such concerns would have been (successfully) addressed by the Developer before receiving the three requested (and still outstanding) permits.

151. Underscoring the lack of a legitimate justification for the Moratorium Ordinance, five councilmembers who voted in favor of Resolution Council Series No. C-6859, the resolution to resolve litigation against the Developer, agreed that it was in the Parish's best interest to resolve the litigation because, among other reasons, "in light of the Louisiana Office of Community Development's determination that the Project will have no significant impact on the human or natural environment."

152. The lack of a legitimate justification also supports a finding that the Moratorium Ordinance was adopted with a discriminatory intent. In particular, at the May 9, 2023 meeting between representatives of the Developer and government officials about the Project, Councilman Fitzgerald only expressed concern with the type of residents who would occupy the apartments and did not address any other concerns about traffic congestion, flooding, zoning, or environmental issues.

153. The Moratorium Ordinance was enacted to block the Developer's mixed-income housing, including workforce or low-to-moderate income housing, which has the effect of

disproportionately making unavailable and denying protected classes rental housing based on race in clear violation of the Fair Housing Act, 42 U.S.C. §3604(a).

154. The Parish's actions to obstruct and delay the Project, as well as negate BCP's contract rights and reasonable expectation to sell the Property to the Developer, through the passage of an illegitimate Moratorium Ordinance are and have been based on discriminatory motives related to the race of the likely residents of the Project.

155. The Parish's actions perpetuate and reinforce patterns of segregation in the City of Covington and its housing market.

156. The Parish's actions impose  a disproportionate harm on protected classes, including African Americans, Hispanics, and persons with disabilities, by depriving them of affordable housing in Covington.

157. Plaintiffs have been injured by the Parish's discriminatory conduct and have suffered damages as a result.

158. The Parish's conduct was intentional, willful, and made in reckless disregard of the known rights of others.

159. Plaintiffs present a claim for judicial relief under the FHA, 42 U.S.C. § 3601 *et seq*.

160. The Parish is liable for the violation of Plaintiffs' rights under the FHA, 42 U.S.C. § 3604(a), under which it is unlawful "[t]o sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin" by, *inter alia*, enacting the Moratorium Ordinance and denying Plaintiffs' ability to obtain the permitting it needs

to develop, and, thus, prohibiting the development of a construction of an affordable housing development that would benefit African Americans, Hispanics, and other protected classes.

161. Further, the Parish is liable for the violation of Plaintiffs' rights under the FHA, 42 U.S.C. § 3617, under which "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." The Parish's actions have interfered with Plaintiffs' efforts to build and operate an affordable housing development that would benefit African Americans, Hispanics, and other protected classes, and such actions constitute retaliation against Plaintiffs for proposing a project that would serve these groups.

162. Plaintiffs seek monetary damages, costs, and reasonable attorneys' fees for the Parish's violations of their rights under the FHA.

163. Plaintiffs are entitled to a judgment declaring that the actions of St. Tammany Parish violate the FHA, 42 U.S.C. § 3601 and 42 U.S.C. § 3617, as well as monetary damages, costs, and reasonable attorneys' fees based on the Parish's violations.

### *Count 2: Louisiana Equal Housing Opportunity Act, LA. REV. STAT. § 51:2601*

164. Plaintiffs incorporate and re-allege as though set out in full herein the allegations contained in the foregoing paragraphs.

165. The Parish, through its actions and omissions, and the actions and omissions of its agents described above, are liable for the violation of Plaintiffs' rights under the Louisiana Equal Housing Opportunity Act, LA. REV. STAT. § 51:2606(1), under which it is unlawful "[t]o sell or

rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, national origin, or natural, protective, or cultural hairstyle."

166. The Parish's actions to obstruct and delay the Project through the passage of the Moratorium Ordinance are and have been based on discriminatory motives related to the race of the likely residents of the Project.

167. The Parish's actions impose a disproportionate harm on African Americans, Hispanics and other protected classes by depriving them of affordable housing in Covington.

168. The Parish's actions perpetuate and reinforce patterns of segregation in the City of Covington and its housing market.

169. Plaintiffs have been injured by the Parish's discriminatory conduct and have suffered damages as a result.

170. The Parish's conduct was intentional, willful, and made in reckless disregard of the known rights of others.

171. Under LA. REV. STAT. § 51:2613 (statute providing enforcement by private persons) Plaintiffs are entitled to a judgment declaring that the actions of the Parish violate the Louisiana Equal Housing Opportunity Act, LA. REV. STAT. § 51:2606, as well as monetary damages (including, but not limited to, actual and punitive damages), costs, and reasonable attorneys' fees based on the Parish's violations.

### Count 3: Americans with Disabilities Act, 42 U.S.C. § 12131, and the Rehabilitation Act, 28 U.S.C. § 794

172. Plaintiffs incorporate and re-allege as though set out in full herein the allegations contained in the foregoing paragraphs.

173. The Moratorium Ordinance and repeated refusal to fully permit the development and construction of the Project violates the anti-retaliation provisions the ADA, 42 U.S.C. § 12131, *et seq*. and its implementing regulations at 28 C.F.R. Part 35, and Section 504 of the Rehabilitation Act of 1973, 28 U.S.C. § 794 and its implementing regulations at 24 C.F.R. Part 8.

174. "The ADA is a 'broad mandate' of 'comprehensive character' and 'sweeping purpose' intended 'to eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American life.'" *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011) (quoting *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001)).

175. Under the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by such entity." 42 U.S.C. § 12132. This federal statute applies to governmental zoning decisions. *See U.S. v. City of New Orleans*, No. 12-2011 (E.D. La. 04/24/2013), 2013 WL 1767787 at *4.

176. "Under the ADA, a disability is defined in the same way that the FHA defines a handicap." *Oxford House, Inc. v. City of Baton Rouge*, La., 932 F.Supp.2d 683, 688 (M.D. La. 2013). A disability is "a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Under the ADA, major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2).

177. "Moratoriums and other zoning practices are actionable under the FHA and the ADA when they have a discriminatory effect on a protected class." *U.S. v. City of New Orleans*, No. 12-2011 (E.D. La. 04/24/2013), 2013 WL 1767787 at *6.

178. The Project will include 2 one-bedroom units that will be occupied by households with at least one member with a disability.

179. The Moratorium Ordinance and the Parish's refusal to allow the construction of the Project has denied individuals who would qualify as disabled access to quality and affordable housing in the community where they work, which deprives them the opportunity to enjoy equal access to housing.

180. Plaintiffs are entitled to a judgment declaring that the Parish's actions violate the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq*., and Section 504 of the Rehabilitation Act of 1973, 28 U.S.C. § 794, as well as monetary damages, costs, and reasonable attorneys' fees based on the Parish's violations.

### Count 4: Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d et seq.

181. Plaintiffs incorporate and re-allege as though set out in full herein the allegations contained in the foregoing paragraphs.

182. The Parish is a recipient of federal Community Development Block Grant funding.

183. The Parish, through its actions and the actions of its agents, are liable for the violation of Plaintiffs' rights under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*., under which, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." The discrimination from which

Plaintiffs are suffering will directly and adversely impact the right of the intended beneficiaries of the Covington Trace Ridge Apartments—including African Americans, Hispanics, and other protected classes—to be free from discrimination.

184. A "recipient" is an entity or person that receives federal financial assistance. *See*, *e.g*., 24 C.F.R. § 1.2(f) (HUD Title VI regulations defining "recipient").

185. "Federal financial assistance" can be an award or grant of money or may include the use or rental of federal land or property at below market value, federal training, a loan of federal personnel, subsidies, and other arrangements with the intention of providing assistance. *See* U.*S. Dep't of Transp. v. Paralyzed Veterans of Am*., 477 U.S. 597, 607, n. 11, 106 S.Ct. 2705, 2712, 91 L.Ed.2d 494 (1986).

186. Plaintiffs have been injured by the Parish's discriminatory conduct and have suffered damages as a result.

187. Plaintiffs are entitled to a judgment declaring that the actions of the Parish violate Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*., as well as monetary damages, costs, and reasonable attorneys' fees based on the Parish's violations.

### Count 5: Civil Action for Deprivation of Rights, 42 U.S.C. § 1983 and the Louisiana Constitution

188. Plaintiffs incorporate and re-allege as though set out in full herein the allegations contained in the foregoing paragraphs.

189. The Parish, including the Parish President and individual council members, are "persons" for purposes of 42 U.S.C. § 1983.

190. The Parish has deprived Plaintiffs of their property and liberty interests under color of law without due process of law in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Louisiana Constitution.

191. A "hallmark of procedural due process that 'a biased decisionmaker is constitutionally unacceptable.'" *Nasierowski Bros. Inv. Co. v. City of Sterling Heights*, 949 F.2d 890, 897 n.8 (6th Cir. 1991) (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)) (alteration adopted). This includes decisions involving zoning and ordinances. *Id*.

192. Plaintiffs have the right to develop the Property free from arbitrary restrictions imposed by biased officials.

193. "A developer has its right to be free of arbitrary or irrational zoning standards." *Wheeler v. City of Pleasant Grove*, 664 F.2d 99 (5th Cir. 1981).

194. The Moratorium Ordinance is an unconstitutional zoning regulation that arbitrarily and capriciously applies to the Project, in violation of the due process clause of the Fourteenth Amendment of the United States Constitution.

195. The Parish unconstitutionality enacted the Moratorium Ordinance to specifically prevent the plaintiffs from exercising their previously-granted permits. *See Wheeler v. City of Pleasant Grove*, 664 F.2d 99 (5th Cir. 1981) (Finding zoning ordinance unconstitutional where a developer was granted a permit to build an apartment complex, there was resistance to the proposed apartment complex, and as such a new ordinance was passed which forbade the construction of new apartments and the developer was forbidden to proceed with the construction of the apartment complex.).

196. The Moratorium Ordinance included the language "or Highway Commercial Zoning Classifications with Lodging (including apartments, hotels, and motels)" because the Project will be developed on Property listed as HC-2 Highway Commercial on the official St. Tammany Parish zoning map.

197. The Parish acted arbitrarily and capriciously in adopting the Moratorium Ordinance because the ordinance, without any rational basis or justification, seeks to thwart the development of the Project.

198. The Moratorium Ordinance has no substantial relation to the public health, safety, morals, or general welfare and bears no rational relationship to a legitimate government interest. There is no conceivable rational basis for the zoning decision other than to thwart the development of the Project.

199. The Developer, through its agent, has already received three permits for the demolition and construction of the apartment complex, and the adoption of the Moratorium Ordinance was intended to be a confiscatory measure to halt development on the Project without a relationship to a legitimate governmental concern.

200. The Parish's arbitrary and capricious acts put the Developer's Investment, plus future profits from the Project, at risk of loss, violating Plaintiffs' protected property interest.

201. Further, the introduction of the Investigation Resolution damaged the reputation of the Developer.

202. This Court should declare that the Moratorium Ordinance, including all iterations applicable to the Plaintiffs' Property and the Project, is an unconstitutional zoning regulation that was enacted with no substantial relationship to legitimate concerts for health, safety, welfare, or

the general well-being of the community and that arbitrarily and capriciously applies to the Property and Project.

203. The Parish's passage of the Moratorium Ordinance violates the Due Process Clause of the United States and Louisiana Constitutions. By engaging in a scheme to improperly adopt the Moratorium Ordinance, without following local laws, including, but not limited to, the Home Rule Charter and the St. Tammany Parish Code of Ordinances, the Parish impermissibly deprived Plaintiffs of their property interest without due process of law.

204. The Parish's actions against Plaintiffs and their Property and Project were arbitrary, capricious, unreasonable, and do not bear a substantial relationship to the St. Tammany Parish's Consolidated Plan for CDBG funding.

205. Plaintiffs have suffered, and will continue to suffer, the deprivation of their vested rights under the United States Constitution and the Louisiana Constitution.

206. Plaintiffs are entitled to a judgment, based on a claim under 42 U.S.C. § 1983, declaring that the Moratorium Ordinance was adopted in violation of the Fifth and Fourteenth Amendments of the U.S. Constitution, as well as monetary damages, costs, and reasonable attorneys' for the Parish's violations.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiffs Military Road Revitalization Company, LLC and BCP Northshore Properties, LLC pray that this Complaint be deemed good and sufficient, that the Defendant, the St. Tammany Parish Government, be ordered to appear and defend said suit, and that after all due proceedings are had, there be judgment rendered herein in favor of Plaintiffs Military Road Revitalization Company, LLC and BCP Northshore Properties, LLC, and against

49

Defendant, the St. Tammany Parish Government, for all relief to which Plaintiffs are entitled, including but not limited to:

A.  A judgment declaring that the actions of the Parish violate the Fair Housing Act, 42 U.S.C. § 3601 and 42 U.S.C. § 3617;

B.  A judgment declaring that the actions of the Parish violate the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq*., and Section 504 of the Rehabilitation Act of 1973, 28 U.S.C. § 794;

C.  A judgment declaring that the actions of the Parish violate the Louisiana Equal Housing Opportunity Act, LA. REV. STAT. § 51:2606.

D.  A judgment declaring that the actions of the Parish violate Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*.

E.  A judgment declaring that the Moratorium Ordinance was adopted in violation of the Fifth and Fourteenth Amendments of the U.S. Constitution;

F.  An award of compensatory and/or punitive damages, including, but not limited to:

    i.  Land acquisition costs, legal fees, development fees, plans, consulting and professional service fees, government agencies permits and fees, architectural fees, engineering and design fees, and management fees;

    ii.  The loss of value of the Property;

    iii.  Lost profits;

    iv.  Interest payments and loan fees;

    v.  Reputational damage;

vi.     The loss of sale of the Property;

vii.     Reasonable attorneys' fees and costs incurred in this action, including, but not limited to, pursuant to 42 U.S.C. §§ 3613(c)(2) and 12205, 28 C.F.R. § 35.175, 29 U.S.C. § 794a(b), 42 U.S.C. § 1983; and

G.     All other such relief to which Plaintiffs may be entitled.

Respectfully submitted,

/s/James M. Garner
JAMES GARNER #19589
STUART D. KOTTLE #37194
**SHER GARNER CAHILL RICHTER**
**KLEIN & HILBERT, L.L.C.**
909 Poydras Street - 28th Floor
New Orleans, LA 70112
Telephone: 504-299-2100
Facsimile: 504-299-2300
jgarner@shergarner.com
skottle@shergarner.com
**Attorneys for Military Road**
**Revitalization Company, LLC and**
**BCP Northshore Properties, LLC**