UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| MILITARY ROAD REVITALIZATION COMPANY, LLC ET AL. | CIVIL ACTION NO. 2:24-CV-00055 |
| | JUDGE: LANCE M. AFRICK |
| VERSUS | |
| | SECTION: I |
| ST. TAMMANY PARISH GOVERNMENT | |
| | MAG. J.: DONNA PHILLIPS CURRAULT |

## SECOND AMENDED COMPLAINT
## FOR DECLARATORY AND MONETARY RELIEF

In accordance with the Court's Order and Reasons, R. Doc. No. 29, Military Road Revitalization Company, LLC files this Second Amended Complaint for Declaratory and Monetary Relief against Defendants St. Tammany Parish Government and Safety National Casualty Corporation, seeking judgments against Defendants for declaratory and monetary relief based on St. Tammany's discriminatory, unconstitutional, and unlawful actions that prevented and otherwise interfered with Military Road's attempt to construct in the City of Covington a multifamily, affordable housing apartment complex for (a) workforce or low-to-moderate income households and (b) permanent supportive housing for persons with disabilities.

## TABLE OF CONTENTS

I. Parties ............................................................................................................................... 3

II. Jurisdiction and Venue ..................................................................................................... 3

III. Facts ................................................................................................................................ 6

   A.  St. Tammany Needs Affordable Housing .......................................................... 6

   B.  The Covington Trace Ridge Apartments Would Have Provided Low-to-Moderate Income Housing and Permanent Supportive Housing for Persons with a Disability ................... 14

   C.  St. Tammany Adopted a Moratorium on Construction of New Multifamily Buildings... 19

   D.  St. Tammany Rejects a Resolution to Resolve Military Road's Litigation ..................... 29

   E.  The Project is No Longer Moving Forward ..................................................... 33

   F.  Safety National's Insurance Covers St. Tammany's Liability for this Lawsuit .............. 35

IV. Claims ............................................................................................................................. 43

   A.  Count 1: Fair Housing Act, 42 U.S.C. § 3604 and 42 U.S.C. § 3617 ............................. 43

     i.  St. Tammany Violated the Fair Housing Act ........................................ 43

       a.  Discriminatory Intent ....................................................... 44

       b.  Discriminatory Effect ....................................................... 46

       c.  St. Tammany's Actions Discriminated on the Basis of Race ............... 47

       d.  St. Tammany's Actions Discriminated on the Basis of Disabilities ................ 50

       e.  St. Tammany's Actions Lacked a Legitimate Justification ................... 50

     ii.  Military Road Seeks Actual and Punitive Damages, Attorney's Fees, and Costs ....... 52

   B.  Count 2: Louisiana Equal Housing Opportunity Act, LA. REV. STAT. § 51:2601 ........... 55

     i.  St. Tammany Violated the Louisiana Equal Housing Opportunity Act ..................... 55

     ii.  Military Road Seeks Actual and Punitive Damages, Attorney's Fees, and Costs ....... 56

   C.  Count 3: Americans with Disabilities Act, 42 U.S.C. § 12131, and Rehabilitation Act, 28 U.S.C. § 794 .................................................................................. 57

     i.  St. Tammany Violated the Americans with Disabilities Act and Rehabilitation Act... 57

     ii.  Military Road Seeks Actual Damages, Attorney's Fees, and Costs ......................... 58

   D.  Count 4: Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d et seq. ................... 60

     i.  St. Tammany Violated the Civil Rights Act ...................................... 60

     ii.  Military Road Seeks Actual Damages, Attorney's Fees, and Costs ......................... 61

   E.  Count 5: Direct Action Claim, LA REV. STAT. § 22:1269 ............................... 62

V. Prayer for Relief ............................................................................................................. 63

## I.   PARTIES

1.     Plaintiff, Military Road Revitalization Company, LLC ("Military Road") is a Louisiana limited liability company domiciled at 812 Gravier Street, Suite 200, New Orleans, Louisiana 70112. Military Road is an entity owned and managed by HRI Communities ("HRIC"), a national real estate company focused on creating high-quality mixed-income and affordable housing communities. HRIC is based in New Orleans, Louisiana and is the successor entity to Historic Restoration, Incorporated ("HRI"), which was formed in 1982.

2.     Defendant, the St. Tammany Parish Government ("St. Tammany"), is a political subdivision of the State of Louisiana, located within the Eastern District of Louisiana, and governed by its Home Rule Charter, with the capacity to sue and be sued. *See* ST. TAMMANY PARISH, HOME RULE CHARTER, art. VII, § 8-01. St. Tammany is responsible for the acts of its agents and employees and is responsible for the enforcement of its zoning code and its ordinances. St. Tammany is a public entity under the Fair Housing Act and the Americans with Disabilities Act, a recipient of federal financial assistance under Section 504 of the Rehabilitation Act, and a place of public accommodation under Louisiana Revised Statutes, Title 51, Section 2232.

3a.     Defendant, Safety National Casualty Corporation ("Safety National"), is a foreign insurer, domiciled in Missouri, with its principal place of business in St. Louis, Missouri, and doing business in Louisiana.

## II.   JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over Military Road's federal claims, including under 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 2000d, 42 U.S.C. § 3601, 42 U.S.C. § 3613(a).

4.    Military Road's claims for relief are authorized by 28 U.S.C. § 1343, the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, Federal Rules of Civil Procedure 57 and 65, as well as the federal statutes identified in the following paragraph.

5.    This action arises under federal statutes, including under the Fair Housing Act of 1988 as amended 42 U.S.C. § 3601, *et seq.* ("FHA"), 42 U.S.C. §§ 1981, 1982, and 1983, and the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.*, ("ADA") and Section 504 of the Rehabilitation Act of 1973, 28 U.S.C. § 794; and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*.

6.    Real estate developers who contracted to purchase land, like Military Road did, have standing to allege a violation of the FHA. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 262, 97 S.Ct. 555, 562, 50 L.Ed.2d 450 (1977) (noting "despite the contingency provisions in its contract. MHDC has expended thousands of dollars on the plans for Lincoln Green and on the studies submitted to the Village in support of the petition for rezoning. Unless rezoning is granted, many of these plans and studies will be worthless even if MHDC finds another site at an equally attractive price."); *see Sunnybrook LP v. City of Alton, Illinois*, 425 F.Supp.3d 1035, 1043 (S.D. Ill. 2019) (stating "real estate developers like Sunnybrook who have contracted to purchase land have a stake in the outcome of the controversy such that they meet the requirements of constitutional standing.").

7.    Under 28 U.S.C. § 1367, this Court has supplemental subject matter jurisdiction over Military Road's state law claims because the state law and the federal law claims arise out of a common nucleus of operative facts.

8.    As further alleged below, Military Road asserts a claim under Louisiana's Direct Action Statute, LA REV. STAT. § 22:1269, against Safety National for all of Military Road's claims

asserted against St. Tammany. A federal court can exercise "supplemental jurisdiction" over a direct action claim that arises out of the same case or controversy as the federal claim. *See City of New Orleans v. Kernan*, 933 F.Supp. 565, 568 (E.D. La. 1996) (finding a plaintiff's negligence claim against a defendant was subject to Louisiana's Direct Action Statute and under state law the insurer can be made a party. Because the claim arises out of the same case or controversy as the claim arising under federal court jurisdiction, the court exercised supplemental jurisdiction over the plaintiff's direct action claim against the defendant's insurer); *see also* R. Doc. 29, at 28, n. 99 ("The Court notes that it has supplemental jurisdiction over the Direct Action Statute claim."),

9.    Military Road's claim against Safety National arises out of the same case or controversy as Military Road's claims against St. Tammany because, as further alleged below, Safety National's insurance covers St. Tammany's liability for this lawsuit.

10.    This Court has personal jurisdiction over Military Road and St. Tammany, which are citizens of Louisiana.

11.    This Court has personal jurisdiction over Safety National under Louisiana's long-arm statute, LA. REV. STAT. § 13:3201. Further, the Policy (defined below) provides, in endorsement PE 117 00 01 22, that "litigation in a court of competent jurisdiction will take place in the state of Louisiana."

12.    Venue over Military Road's claims against St. Tammany is proper in the Eastern District of Louisiana because under 28 U.S.C. § 1391(b)(1) St. Tammany resides in this district and under 28 U.S.C. § 1391(b)(2) all acts complained of occurred in this district.

13.    Venue over Military Road's direct action claim against Safety National is proper in the Eastern District of Louisiana because, under 28 U.S.C. § 1391(b)(2), all acts complained of

occurred in this district and, under 28 U.S.C. § 1391(b)(3), Safety National is subject to this Court's personal jurisdiction.

### III. <u>FACTS</u>

#### A. *St. Tammany Needs Affordable Housing*

14.    St. Tammany has a significant need for affordable housing, and, thus, is a recipient of federal Community Development Block Grant ("CDBG") funding to help combat St. Tammany's housing problems.

15.    To receive CDBG funds, St. Tammany is required to submit to the U.S. Department of Housing and Urban Development ("HUD") a "Consolidated Plan" that serves as its planning document, application for federal funds, a strategy to follow when administering HUD program funds, and an action plan for budgeting, goal setting, and performance assessment. *See* 24 C.F.R. § 91.200(c), *id*. at § 91.220(b), R. Doc. No. 1-1, 2023–2027 CDBG Consolidated Plan. The Consolidated Plan identifies many of the housing problems in St. Tammany and these problems' disproportionate impact on protected classes.

16.    St. Tammany's affordable housing problem is caused, in part, by being predominately zoned for single-family housing:



R. Doc. No. 1-1, 2023–2027 CDBG Consolidated Plan, at 52.

17.    Multifamily housing units only represent 11.7% of all St. Tammany's housing stock. *See id.* at 51.

18.    According to an August 2023 report prepared by St. Tammany's Department of Grants, titled St. Tammany 2023 Community Needs Assessment, the majority of households in St. Tammany are one- to two-person households:

**Household Occupancy in St. Tammany Parish (2021)**

Table 6.

| # Of Occupants | Parish Total # | Parish Total % | Owner Occupied # | Owner Occupied % | Renter Occupied # | Renter Occupied % |
|---|---|---|---|---|---|---|
| 1-person | 25,421 | 24.60% | 18,341 | 22.20% | 7,080 | 33.80% |
| 2-person household | 39,118 | 37.80% | 32,932 | 39.90% | 6,186 | 29.50% |
| 3-person household | 11,947 | 11.60% | 9,679 | 11.70% | 2,288 | 10.90% |
| 4 or more-person household | 27,037 | 26.10% | 21,643 | 26.20% | 5,394 | 25.70% |

Source: U.S. Census Bureau, American Community Survey (ACS) and Puerto Rico Community Survey (PRCS), 5-Year Estimates.

*See* R. Doc. No. 1-2, St. Tammany 2023 Community Needs Assessment, at 12.

19.    As noted in the St. Tammany 2023 Community Needs Assessment report, the "housing market has not shown significant signs of keeping up with rental market demand" and this trend "should remain an important focus area when considering the current and future needs of the Parish." *Id*. at 12.

20.    The "most common housing problem within St. Tammany Parish is cost burden, affecting both homeowners and renters in the Parish. Black, American Indian, and Alaskan households are disproportionately affected by cost burden in the low- to moderate-income level groups." R. Doc. No. 1-1, 2023-2027 CDBG Consolidated Plan, at 4.

21.    Low- to moderate-income level households are those households with income levels of 80% or less of Area Median Income ("AMI"). *See* 42 U.S.C. § 1437a(b)(2)(A), Section 3 of the U.S. Housing Act of 1937 ("The term 'low-income families' means those families whose incomes do not exceed 80 per centum of the median income for the area . . . ."); *see also* 42 U.S.C. § 1437f(o)(4)(c), Section 8 of the U.S. Housing Act of 1937 (providing definitions of low-income families eligible to receive assistance); *see also* 24 C.F.R. § 570.3, Regulations Related to Housing and Urban Development, Community Development Block Grants ("Low- and moderate-income household means a household having an income equal to or less than the Section 8 low-income limit established by HUD."); *see also* Methodology for Determining FY 2023 Section 8 Income Limits, https://www.huduser.gov/portal/datasets/il//il23/IncomeLimitsMethodology-FY23.pdf ("The statutory basis for HUD's income limit policies is Section 3 of the U.S. Housing Act of 1937, as amended.").

22.    According to data from the 2021 American Community Survey, 5-year data, "[t]he median household income of St. Tammany Parish residents in 2021 (after inflation adjustment)

was $66,582, with homeowners earning a median annual income of $78,386 and renters earning $44,969." R. Doc. No. 1-1, 2023-2027 CDBG Consolidated Plan, at 18.

23.   "[HUD] defines a person [as] being 'rent burdened' when their monthly rental costs exceed 30% of their monthly income. Per the University of New Orleans Institute for Economic Development and Real Estate Research's 2022 Annual Real Estate Market Analysis report, the average monthly cost of rent in St. Tammany Parish through the second quarter of 2022 is $1,875, suggesting that 86.8% of renters in St. Tammany Parish could be considered 'burdened' by their monthly rental payments." *Id.* at 18.

24.   "[H]ouseholds making less than $50,000 per year are experiencing high cost burdens, while there is insufficient housing stock for the growing population of single-person households in the Parish." *Id.* at 56.

25.   Low-income residents have limited affordable housing options in St. Tammany, with many areas in St. Tammany having a relatively small percentage of housing units affordable to persons who earn 30% of the AMI:



R. Doc. No. 1-2, St. Tammany 2023 Community Needs Assessment, at 14.

26.   "[T]he racial/ethnic demographics of St. Tammany Parish are currently 76.5% white, 13.9% black, 6.2% Hispanic, 2% Two or more races, 1.6% Asian or Pacific Islander, and 0.6% Native American." R. Doc. No. 1-1, 2023–2027 CDBG Consolidated Plan, at 26.

27.   Further, "[t]he demographic makeup and economics of St. Tammany Parish are subject to some segregation according to the HUD Dissimilarity Index values (which help to identify disparities that occur along racial lines in the United States). Black/white comparisons measured at moderate segregation with a current dissimilarity trend of 43.9, whereas overall non-white/white measured at 30.8, or low segregation." *Id.* at 26–27.

28.    At the income level 0% to 30% of AMI, "Black/African (906 households), American Indian, Alaska Natives (114 households), and Hispanics (272 households) are disproportionately affected by one or more housing problems;" "Black/African American (734 households) and American Indian, Alaska Natives (114 households) are disproportionately affected by severe housing problems;" "Black/African American (733 households) and Hispanics (246 households) are disproportionately affected by one or more housing problems;" and "Black/African American (589 households) and Hispanics (167 households) are disproportionately affected by severe housing problems." *Id.* at 33–34.

29.    At the income level 50% to 80% of AMI, "Black/African American (772 households) are disproportionately affected by one or more housing problems;" and "Black/African American (305 households), American Indian, Alaska Natives (50 households) and Hispanics (149 households) are disproportionately affected by severe housing problems." *Id.* at 34.

30.    These housing problems are only going to get worse. "St. Tammany Parish experienced significant population growth in recent years; according to recent Census estimates, between 2020 and 2022 the population grew from 263,446 to approximately 288,859, or an increase of 9.6%." *Id.* at 48.

31.    Despite the estimated population growths, "St. Tammany Parish continues to experience a ***slow growth of multifamily units***. Twelve multifamily construction units were approved in 2019 and none have been approved in the years since. . . . [A] lack of multifamily units in the Parish may be contributing to housing burdens for [low-to-moderate income] residents." *Id.* at 48. (emphasis added).

32.    "Like many other American communities, St. Tammany has faced pushback from residents about the development of affordable housing." *Id.* at 76. While St. Tammany claims that

most residents who completed a community survey in 2023 expressed support for development of affordable housing, some of the comments include a desire for "less people," especially "those on public dependency." *Id.* at 76. The survey does not meaningfully represent residents of St. Tammany as only 90 people completed the survey. *See* R. Doc. No. 1-2, St. Tammany 2023 Community Needs Assessment, at 55.

33.    The City of Covington is no exception to St. Tammany's worsening housing trends, as zip codes in Covington are projected to have the highest percentages of growth in St. Tammany:

| Table 1. | Zip Code | 2022 Pop. | Projected 2027 Pop. | % Change |
|---|---|---|---|---|
| | 70420 – Abita Springs | 8,130 | 8,281 | 0.37% |
| | 70431 – Bush | 6,179 | 6,478 | 0.95% |
| | 70433 – Covington | 43,192 | 45,889 | 1.22% |
| | 70435 – Covington | 22,888 | 25,007 | 1.79% |
| | 70437 – Folsom | 8,106 | 8,463 | 0.87% |
| | 70445 – Lacombe | 11,048 | 11,543 | 0.88% |
| | 70447 – Madisonville | 17,699 | 18,667 | 1.07% |
| | 70471 – Mandeville | 23,042 | 23,573 | 0.46% |
| | 70448 – Mandeville | 25,905 | 26,123 | 0.17% |
| | 70452 – Pearl River | 13,383 | 13,594 | 0.31% |
| | 70458 – Slidell | 38,716 | 39,883 | 0.60% |
| | 70460 – Slidell | 22,514 | 22,604 | 0.08% |
| | 70461 – Slidell | 31,124 | 31,983 | 0.55% |

Source: *Desire Line Population Projection based on estimates from Esri & U.S. Census, 2020*

R. Doc. No. 1-2, St. Tammany 2023 Community Needs Assessment, at 8.

34.    Covington is experiencing a shortage of rental housing units at all income levels, but especially for the area's low-to-moderate income households who are increasingly cost burdened. According to a market study performed by Cook, Moore, Davenport & Associates, based on a currently outdated apartment stock, a growing population, inflation, and rising median income, the city will need to add approximately 700 units of workforce housing by 2024:



R. Doc. No. 1-3, May 9, 2023 Presentation.

35.    St. Tammany claims it "remains up to date on fair housing compliance and awareness" and its "goals and priorities include continuous on-going evaluations of the four fair housing issues identified as critical by the Department of Housing and Urban Development, including racially and ethnically concentrated areas of poverty (R/ECAPs); segregation; disparity in access to opportunity; and disproportionate housing needs." R. Doc. No. 1-2, St. Tammany 2023 Community Needs Assessment, at 22; *see also* R. Doc. No. 1-4, Assessment of Fair Housing, Final Report, Prepared by Asakura Robinson for the St. Tammany Parish Department of Human Services and City of Slidell Planning Department (January 4, 2018).

36.    Despite claiming to be up-to-date on fair housing compliance and recognizing St. Tammany's need for affordable housing, St. Tammany prevented the construction of an affordable, multifamily housing development in Covington.

### B. *The Covington Trace Ridge Apartments Would Have Provided Low-to-Moderate Income Housing and Permanent Supportive Housing for Persons with a Disability*

37.   Military Road planned to develop a project (the "Covington Trace Ridge Apartments" or the "Project"), located on Lot 1, consisting of 5.328 acres located at 72147 Military Road in Covington, Louisiana (the "Property"). An image of the proposed developed is displayed below:



R. Doc. No. 1-3, May 9, 2023 Presentation.

38.   The Property is listed as HC-2 Highway Commercial on the official St. Tammany zoning map.

39.   A comprehensive plan for the unified zoning and development of lands in St. Tammany was adopted on or about September 3, 2009, by Ordinance No. 4029, Council Series No. 09-2116 (the "Comprehensive Zoning Plan"). The Comprehensive Zoning Plan was adopted in accordance with LA. REV. STAT. § 33:106 and was based on an exhaustive two (2) year study to establish zoning classifications required for the orderly development of lands in St. Tammany.

14

40.     The zoning districts established under the Comprehensive Zoning Plan are codified as the St. Tammany Parish Unified Development Code – Volume 1, which establishes uniform zoning districts that could be relied upon for future developments, traffic, drainage and maintained property values.

41.     St. Tammany created a HC-2 Highway Commercial District ("HC-2"), "to provide for the location of moderately scaled, more intense retail, office and service uses, generally located along major collectors and arterials designed to provide services to a portion of the parish." ST. TAMMANY PARISH, UNIFIED DEVELOPMENT CODE, art. IV, § 130-917.

42.     A permitted use of property located in HC-2 includes "Lodging, 100 rooms or less (including apartments, hotels, motels)." ST. TAMMANY PARISH, UNIFIED DEVELOPMENT CODE, art. IV, § 130-918(b)(12).

43.     Permitted uses are considered "by right" and do not require approval of St. Tammany's Zoning Commission, Planning Commission, or the Parish Council of St. Tammany Parish (the "Parish Council"). *Id*. at art. IV, § 130-918(a) ("Use by right subject to any minimum standards as listed in section 130-2213"); *see also id*. at art. VII, § 130-2213 (providing minimum standards for specific uses).

44.     Military Road and BCP Northshore Properties, LLC ("BCP"), the former owner of the land and improvements located at the Property, executed a Purchase and Sale Agreement, including amendments, regarding the Property, in which BCP had agreed to sell and the Military Road had agreed to purchase all of BCP's right, title, and interest in and to the Property (the "Purchase Agreement").

45.   Since early 2022, Military Road had been working with BCP, engaging with government officials, cooperating with utility providers, and seeking to ensure environmental compliance for the Project.

46.   The Project would have been a high-quality, 100-unit, mixed-income and disaster-resilient community. 51% of the units targeted (a) low-to-moderate income housing (or workforce housing), *i.e.*, households with income levels of 80% or less of AMI and (b) permanent supportive housing ("PSH"), *i.e.*, households with at least one member with a disability:



R. Doc. No. 1-3, May 9, 2023 Presentation.

47.   In particular, the Project would have included 44 one-bedroom units that would have been occupied by households with income levels of 80% or less of AMI and 5 two-bedroom units that would have been occupied by households with income levels of 80% or less of AMI.

48.    Further, the Project would have included 2 one-bedroom units that would have been occupied by households with at least one member with a disability.

49.    The Project's 81 one-bedroom units and 19 two-bedroom units, in three buildings, would have complied with all St. Tammany zoning requirements, including, but not limited to, requirements for setbacks, height, building size, landscaping, fill, and drainage.

50.    The Project would have eliminated a blighted and underused property and provided much needed rental housing to the local workforce or low-to-moderate income households, including retail and service industry workers in the area, as well as market-rate housing, in a first-class development in a prime location:



R. Doc. No. 1-3, May 9, 2023 Presentation.

51.    The Project's workforce or low-to-moderate income household units would have provided high quality housing to individuals who work in Covington but are not able to find

housing in Covington, the majority of whom are protected classes, including African Americans and Hispanics.

52.   On January 3, 2023, the Louisiana Office of Community Development ("OCD") awarded Military Road a Middle Market Loan Funding for the Project. *See* R. Doc. No. 1-5, January 3, 2023 Award of 2022 Middle Market Loan Funding. The OCD provides funds from the United States of America, HUD Community Development Block Grant – Disaster Recovery Program ("CDBG-DR") to qualified applicants, in accordance with the State's Action Plan for Utilization of Community Development Block Grant Funds in Response to the Great Floods of 2016, as amended. The OCD awarded Military Road a CDBG-DR award pursuant to the Notice of Funding Availability and Program Implementation Guidelines for Multifamily CDBG-DR Loan Funding for the Middle Market Loan Program, published on January 14, 2022, as amended.

53.   Military Road, through its agent, began applying for applicable government permits in March of 2023. In particular, on March 8, 2023, Military Road submitted applications for a Land Clearing Permit and a Demolition Permit. Subsequently, on April 5, 2023, Military Road applied for a permit to convert its lot from 3 subdivisions into a single lot. Lastly, in May of 2023, Military Road applied for applicable building permits.

54.   Based on the HC-2 Highway Commercial zoning and guidance from the St. Tammany Planning and Permits Department, by the summer of 2023, Military Road had incurred approximately $2 million on land acquisition costs, legal fees, development fees, consulting and professional service fees, government agencies permits and fees, engineering and design fees, and management fees.

55.   Prior to the recent events that are the subject of this litigation, construction on the Project was scheduled to begin in July 2023 and to be completed by September 2024.

### C.  St. Tammany Adopted a Moratorium on Construction of New Multifamily Buildings

56.   In 2023, St. Tammany considered and adopted ordinances to impose a moratorium on rezoning and/or permitting for the construction of multifamily buildings in Districts 1 and 2 of St. Tammany Parish, Ord. Cal. No. 7254, Ord. Cal. No. 7254AA, and Ord. Cal. No. 7440 (For simplicity, these ordinances will also be referred to collectively as the "Moratorium Ordinance.")

57.   On May 4, 2023, the Parish Council introduced the Moratorium Ordinance, Ord. Cal. No. 7254, an ordinance to impose a moratorium on rezoning and/or permitting for the construction of multifamily buildings in Districts 1 and 2, Wards 1, 2, and 3, specifically to property zoned for multifamily residences, A-6, A-7, A-8.

58.   The Moratorium Ordinance introduced on May 4, 2023, Ord. Cal. No. 7254, did not apply to property zoned as Highway Commercial or "HC."

59.   At a meeting held in the Parish President's office on May 9, 2023, Military Road presented the Project to several government officials, including Councilman David R. Fitzgerald, Parish President Michael B. Cooper, the Chief Administrative Officer for the City of Covington, and a representative of OCD.

60.   At the May 9, 2023 meeting, Councilman Fitzgerald claimed he first learned of the Project and had not been consulted about the Project. Councilman Fitzgerald expressed outrage at the Parish President for letting the project proceed to a "done deal level" without either the Administration or representatives of Military Road consulting him sooner.

61.   Councilman Fitzgerald, using an aggressive tone and demeanor, asked about the type of residents who would live at the apartments. When learning that the apartments would be occupied by mixed-income residents, Councilman Fitzgerald stated that his constituents would

"hate" the Project and be very upset with him if it got built. Councilman Fitzgerald stated that he did not want Section 8 housing, as provided by the Project. It was clear that Councilman Fitzgerald's concern was that apartments that served lower income people were being built in his district and that affluent neighborhoods who lived nearby would attack him if the Project was able to proceed, particularly in the election year when Mr. Fitzgerald sought re-election in the Fall of 2023.

62.   Following the May 9, 2023 meeting, the Parish Council prepared an ordinance to amend its proposed Moratorium Ordinance to include the zoning district in which the Project is located. Indeed, in a Parish Council newsletter (distributed via e-mail on July 14, 2023), the Parish Council admitted that its intent in the amended moratorium was to stop the development of the Project:

> After the District 1 and 2 multifamily moratorium was introduced by the Council in May, a meeting was held with District 2 Councilman David Fitzgerald, to unveil the Covington Trace Ridge Apartments development. The Councilman was informed that the ==multifamily moratorium== introduced in this district ==would not apply to this development== because of the highway commercial zoning in place at the proposed site. ==The Council therefore amended its multifamily moratorium== to include highway commercial zoning classifications at a meeting on May 17th and adopted the moratorium on June 1st.

*See* R. Doc. No. 1-6, July 14, 2023 Newsletter (emphasis added).

63.   Additionally, following the May 9, 2023 meeting, the Parish Council prepared a resolution to "investigate" the Parish President for allowing the Project; specifically, the Parish Council prepared Resolution Council Series No. C-6775, a "resolution to convene an investigation and review into the manner in which the proposed Covington Trace Ridge Apartments has been processed." (the "Investigation Resolution"). *See* R. Doc. No. 1-7, Investigation Resolution.

64.    The Investigation Resolution was prepared and introduced as a political device to attack the Parish President and to encourage residents, particularly affluent residents, to express opposition to an apartment complex that would primarily serve low-to-moderate income residents.

65.    On May 18, 2023, before the Parish Council's meeting that day, representatives of Military Road met with government officials, including Councilman Fitzgerald and representatives of the Parish's District Attorney's Office, including Terry Hand, Carey Menard and Emily Couvillon, to discuss the Project. In that meeting, Councilman Fitzgerald again expressed his opposition to the Project, stating the best use of the site would be a dog park. Mr. Hand also stated that residents have been notified of the Project and that Military Road should anticipate community opposition. None of the comments by government officials addressed the City of Covington's and/or St. Tammany's need for workforce or low-to-moderate income housing.

66.    At the Parish Council's meeting on May 18, 2023, the Parish Council introduced an amended version of the Moratorium Ordinance, Ord. Cal. No. 7254AA, which amended the May 4, 2023 introduced version, and added the language "or Highway Commercial Zoning Classifications with Lodging (including apartments, hotels, and motels)," language that was *not* included in the May 4, 2023 introduced version, Ord. Cal. No. 7254. *See* R. Doc. No. 1-8, Ord. Cal. No. 7254AA. A video of the Parish Council's May 18, 2023 meeting is available at https://www.youtube.com/watch?v=RdMxz8VDtV4&list=PLH9u5rn0HS1fI0QIFY9idTmumZw xPHv4Z&index=13.

67.    The Moratorium Ordinance, Ord. Cal. No. 7254AA, did not include *all* zoning or overlay classifications that allow apartment projects, such as the zoning classification Planned Business Campus or the overlay classification Planned United Development, *see generally* St.

TAMMANY PARISH, UNIFIED DEVELOPMENT CODE, art. IV, § 130-839 (PBC-1 Planned Business Campus), *id*. at § 130-863 (PBC-2 Planned Business Campus), *id*. at § 130-1672.

68.    The Moratorium Ordinance, Ord. Cal. No. 7254AA was clearly targeted and retaliatory, specifically aimed to stop the Project, and in particular, to keep out workforce or low-to-moderate income residents, who are mostly African American and Hispanics, in the affluent neighborhood adjacent to the Property.

69.    On May 24, 2023, Military Road, through its agent, received a Demolition Permit, 2023-1124 (which was applied for on March 8, 2023).

70.    On May 31, 2023, the OCD issued a public notice of Finding of No Significant Impact ("FONSI"), determining that the Project would have no significant impact on the human or natural environment:

> FINDING OF NO SIGNIFICANT IMPACT
> The OCD has determined that the project will have no significant impact on the human or natural environment.
> Therefore, an Environmental Impact Statement under the National Environmental Policy Act of 1969 (NEPA) is not required. Additional project information is contained in the Environmental Review Record (ERR) on file at the OCD office at 617 N. Third Street, Baton Rouge, Louisiana and may be examined weekdays between 8:00 am to 4:00 pm. The ERR can be made available to the public for review electronically. Please submit your request by emailing Murilo Martins at Murilo.Martins@LA.GOV or calling (225) 219-0098.

*See* R. Doc. No. 1-9, May 31, 2023 FONSI (emphasis added).

71.    On May 31, 2023, the Moratorium Ordinance, Ord. Cal. No. 7254AA, was republished.

72.    On June 1, 2023, Military Road, through its agent, received a Land Clearing Permit, 2023-11024.

73.    In a memorandum received by a representative of Military Road on June 1, 2023, Ross Liner, Director of the Department of Planning & Development of St. Tammany, confirmed to Military Road, through its representative, the following permittable uses of the Property:



**ST. TAMMANY PARISH**
MICHAEL B. COOPER
PARISH PRESIDENT

**DEPARTMENT OF PLANNING AND DEVELOPMENT**

==Re: Lot 1 (5.328 Acres) at 72147 Military Road==

Dear Mr. Schoen,

As per your request of Lot 1 (5.328 Acres) at 72147 Military Road this memo will verify the ==allowable uses under the HC-2 Highway Commercial zoning district,== Chapter 130, Article IV, Division 25 of the St. Tammany Parish Unified Development Code (Council Ordinance 10-2234).

1. Lot 1 (5.328 Acres) at 72147 Military Road is ==listed as HC-2== Highway Commercial (Council Ordinance ==10-2234)== on the official St. Tammany Parish zoning map.
2. As per Sec. 130-918(b)(12), "==Lodging, 100 rooms or less (including apartments,== hotels, motels)" is a ==permitted use== within the HC-2 Highway Commercial District zoning classification (latest revision Council Ordinance ==11-2532).== ==Previous apartment/multi-family developments in St. Tammany Parish, rooms have been interpreted as individual== units.
3. Lot 1 (5.328 Acres) at 72147 Military Road appears to have been ==classified HC-2 Highway Commercial in 2010 (==Council Ordinance 10-2234).

==Permitted uses== listed in Sec. 130-918. - Permitted uses; are considered =="by right"== and do not require Zoning Commission, Planning Commission, or Parish Council approval. If all aspects of site design criteria, state and federal agency approvals, and payments meet ordinance a permit will be granted, should a variance be needed application to and a public hearing in front of the Board of Adjustments will be required before a permit is issued.

Please don't hesitate to contact my office for further assistance in this matter, or otherwise.

Sincerely,

Ross Liner, AICP, PTP, CFM

R. Doc. No. 1-10, June 1, 2023 Letter of Ross Liner (emphasis added).

74.    Furthermore, at least two apartment complexes are located in HC zones: (1) Artesia Apartments (8382 Westshore Dr., Covington) - HC-3 zoning, 264 apartments, built in 2017 and (2) The Fairlane (101 Holiday Square Blvd., Covington) - HC-3 zoning, 86 units, converted from a hotel into apartments in 2022.

75.    On June 1, 2023, the Parish Council considered the Moratorium Ordinance, Ord. Cal. No. 7254AA and the Investigation Resolution, Resolution Council Series No. C-6775.  A video of the Parish Council's June 1, 2023 meeting is available at https://www.youtube.com/watch?v=xiC8sw_t5bk&list=PLH9u5rn0HS1fI0QIFY9idTmumZwxPHv4Z&index=12.

76.    Ord. Cal. No. 7254AA provided, in pertinent part:

> ORDINANCE TO IMPOSE A SIX (6) MONTH MORATORIUM ON
> RECEIPT OF SUBMISSIONS BY THE PARISH ZONING COMMISSION
> FOR THE REZONING OF MULTI-FAMILY PROPERTY AND/OR ON THE
> ISSUANCE OF CERTAIN PERMITS BY THE PARISH DEPARTMENT OF
> PLANNING    AND    DEVELOPMENT/PERMITS    FOR    THE
> CONSTRUCTION OR PLACEMENT OF NEW MULTI-FAMILY BUILDING
> STRUCTURES ON PROPERTY ZONED A-6, A-7, A-8, OR HIGHWAY
> COMMERCIAL    ZONING    CLASSIFICATIONS    WITH    LODGING
> (INCLUDING APARTMENTS, HOTELS, MOTELS) IN WARDS 1, 2, AND
> 3, DISTRICTS 1 AND 2.

R. Doc. No. 1-8, Ord. Cal. No. 7254AA.

77.    At the June 1, 2023 meeting, Councilman Fitzgerald spoke against the Project and in favor of the Investigation Resolution. Standing up while speaking, Councilman Fitzgerald called the Project "mysterious," stating he found out about the Project on May 9, 2023 and that he wanted to find out how the Project so easily progressed. With a raised tone, Councilman Fitzgerald claimed that the Parish President stated in a couple of conversations that he is not an advocate of the Project and that, in response, Councilman Fitzgerald would ask, "then if you're not, who is?" Members of the audience cheered Councilman Fitzgerald's statement.

78.    At the June 1, 2023 meeting, residents spoke out against the Project. One resident called St. Tammany "really out of control in many different ways," and further added that he was "not an advocate at all of government subsidized housing." Another resident, speaking for his homeowner's association, stated they were "strictly against" the Project and stated that it was the Parish Council's "job to stop it and keep it from going any further." Another resident called the Project a "comedy of errors" that "affects the very lives of the citizens of this particular Parish," and requested the Parish Council think about "100 rooms when you think about apartments." Members of the audience applauded enthusiastically at numerous times during the comments.

79.     Several residents spoke out against the Project's effect on traffic, flooding, and the environment, although these comments lacked support and were unfounded. Military Road worked diligently with government officials, including filing necessary paperwork and applications with permitting departments, and was responsive to the St. Tammany's Planning and Engineering staff during the course of the development of the Project.

80.     At the June 1, 2023 meeting, the CEO for Military Road's affiliated entity was given three minutes to speak. During that brief presentation, Mr. A. Thomas Leonhard, Jr., defended the merits of the Project, including complementing the planning, engineering and permit staff for working constructively to ensure the Project design fits all of laws and legal requirements. Mr. Leonhard also stated he opposed the Investigation Resolution, which wrongly suggested some sort of back-door or nefarious deal led to the Project, all of which is unwarranted and untrue.  Mr. Leonhard stated his company has played by the rules and that the Project will be the "finest apartment building in St. Tammany," which resulted in members of the audience laughing.

81.     At the June 1, 2023 regular meeting, the Moratorium Ordinance, Ord. Cal. No. 7254AA, was declared adopted.

82.     Also at the June 1, 2023 Parish Council regular meeting, the Parish Council adopted the Investigation Resolution, Resolution Council Series No. C-6775.

83.     The stated purpose of the Moratorium Ordinance—namely, that population growth has outpaced improvements to traffic and drainage infrastructure—is pretextual. As noted above, OCD issued a public notice determining that the Project would have *no* significant impact on the human or natural environment.

84.   Further, St. Tammany has not explained what traffic and drainage infrastructure issues necessitated the Moratorium Ordinance. Indeed, the language of the Moratorium Ordinance introduced at the Parish Council's May 4, 2023 meeting did *not* apply to the Property of Military Road's proposed development. Only 14 days later, on May 18, 2023, the Parish Council introduced an amended version of the Moratorium Ordinance, Ord. Cal. No. 7254AA, which amended the May 4, 2023 introduced version, and added the language "or Highway Commercial Zoning Classifications with Lodging (including apartments, hotels, and motels)." St. Tammany has not provided any explanation for what traffic and drainage infrastructure issues were identified during those 14 days that necessitated expanding the scope of the Moratorium Ordinance to include the Property and Military Road's Project.

85.   Additionally, concerns about traffic and drainage infrastructure apply equally to single-family developments as they do to multifamily developments, and such concerns would have been successfully addressed by Military Road before receiving the three remaining permits.

86.   On June 5, 2023, Military Road, through its agent, received a Building Permit, 2023-2319.

87.   On June 8, 2023, the Parish President signed the Moratorium Ordinance, Ord. Cal. No. 7254AA, and, as a result, it was "finally enacted." *See* ST. TAMMANY PARISH GOVERNMENT, HOME RULE CHARTER, art. I, § 2-13(B); *id*. at § 2-12(C).

88.   On June 9, 2023, the Chair of the Parish Council sent a letter on behalf of the Parish Council to OCD objecting to its FONSI, which was issued to Military Road, claiming it received inadequate notice and a lack of information. According to the letter, the Parish Council received information that conditions at the site of the proposed project are "less than ideal," claiming fill will be required and soil borings on the site show evidence of various contaminants. The letter did

26

not identify or attach any evidence supporting its assertions regarding the environmental conditions of the site.

89.    Military Road applied for, but did not receive, the following building permits: Construction Phase 1 Building Permit for a structure referred to as "Building B" (2023-2129), Construction Phase 2 Building Permit for a structure referred to as "Building A" (2023-2130), and Construction Phase 3 Building Permit for a structure referred to as "Townhomes." (2023-2131).

90.    In response to its permit applications, Military Road received comments by St. Tammany's engineers, which noted the existence of the Moratorium Ordinance. *See* R. Doc. No. 21-10, at 115 ("Property currently under a moratorium per Council Od. 23-5152 on the issuance of permits for new construction or placement of any new residential building structures in a multi-family residential district (A-6 through A-8), or Highway Commercial Zoning Classifications."); *see also* R. Doc. No. 29, at 14.

91.    On June 30, 2023, Military Road filed suit against St. Tammany in Louisiana State Court, the 22nd Judicial District Court, seeking a judgment declaring that the Moratorium Ordinance is null and void under state law and/or a judgment declaring that Military Road's Project is exempt from the Moratorium Ordinance, in the matter titled *Military Road Revitalization Company, LLC v. St. Tammany Parish Government*, pending before the Honorable William H. Burris, 22nd Judicial District Court, Division "E," Case No. 2023-13320 (the "State Litigation"). The claims in the State Litigation did not include the federal claims alleged in this Second Amended Complaint and "the two actions are not sufficiently parallel to warrant *Colorado River* abstention." R. Doc. 29, at 22.

92.     At its regular monthly Council meeting on July 13, 2023, the Parish Council introduced an ordinance to amend St. Tammany's Unified Development Code to remove the word "apartments" as a permitted use by right in certain zoning classifications, including HC-2.

93.     On September 18, 2023, the district judge in the State Litigation conducted a hearing on Military Road's request for a preliminary injunction (based on violations of state law) and denied Military Road's request. Military Road sought appellate review of the state court ruling by applying for a supervisory writ application with the Louisiana First Circuit Court of Appeal.

94.     On November 2, 2023, the Parish Council introduced Ord. Cal. No. 7440, a proposed ordinance to extend the Moratorium Ordinance, Ord. Cal. No. 7254AA, for an additional six months.

95.     On December 7, 2023, the Parish Council adopted Ord. Cal. No. 7440 and extended the Moratorium Ordinance, which continued its ban on the proposed construction of the Project by Military Road at the Property. A video of the Parish Council's December 7, 2023 meeting is available at https://www.youtube.com/watch?v=MWUuxOlDwsM&list=PLH9u5rn0HS1fI0 QIFY9idTmumZwxPHv4Z&index=1&t=12119s.

96.     Also on December 7, 2023, the Parish Council considered Ord. Cal. No. 7465, an ordinance to rename and reorganize the Unified Development Code. Among other changes, a renamed and reorganized Unified Development Code would remove the word "apartments" as a permitted use in certain zoned property, including property zoned HC-2.

97.     With respect to the considered changes to the Unified Development Code, at the December 7, 2023 meeting, the Parish Council also amended and re-introduced an amendment that exempted the Property from the changes to the Unified Development Code.

28

98.   During the Parish Council's discussion of an amendment that exempted the Property from changes to the Unified Development Code, Mr. Liner, Director of the Department of Planning & Development, represented that the Project is the only current development of apartments and could not identify any other developments of apartments in St. Tammany.

### D.  St. Tammany Rejects a Resolution to Resolve Military Road's Litigation

99.   On December 18, 2023, the Parish Council considered a resolution, sponsored by the Parish President and Chair of the Parish Council, Resolution Council Series No. C-6859, to resolve the litigation between Military Road and the Parish. *See* R. Doc. No. 1-11, Resolution Council Series No. C-6859.

100.  Resolution Council Series No. C-6859 would have (a) authorized the Parish President to negotiate and execute a consent judgment and settlement and release agreement, (b) vacated, in part, the Moratorium Ordinance to exclude the Project, and (c) authorized the Parish President to apply CDBG funds for the development of the Project.

101.  Resolution Council Series No. C-6859 noted that Military Road had shared a draft federal complaint that would allege, among other allegations, violations of the FHA and the ADA. Resolution Council Series No. C-6859 noted that:

> WHEREAS, St. Tammany Parish Administration and the St. Tammany Parish Council believe it is in the best interest of St. Tammany Parish Government to resolve amicably the claims asserted or that could have been brought in the State Litigation and Federal Litigation (a) to avoid continued and protracted litigation and (b) in light of the Louisiana Office of Community Development's determination that the Project will have no significant impact on the human or natural environment.

R. Doc. No. 1-11, Resolution Council Series No. C-6859.

102.  At the December 18, 2023 meeting, at which the Parish Council considered Resolution Council Series No. C-6859, five councilmembers voted in favor of the resolution.

103.  The five councilmembers who voted in favor of Resolution Council Series No. C-6859 agreed that it was in the best interest of the Parish to resolve amicably the claims asserted and could have been asserted by Military Road.

104.  The five councilmembers who voted in favor of Resolution Council Series No. C-6859 agreed that it was in St. Tammany's best interest to resolve litigation asserted Military Road in light of Military Road's shared draft of a federal complaint alleging violations of the FHA and the ADA.

105.  The five councilmembers who voted in favor of Resolution Council Series No. C-6859 agreed that it was in St. Tammany's best interest to resolve litigation asserted by Military Road "in light of the Louisiana Office of Community Development's determination that the Project will have no significant impact on the human or natural environment."

106.  The councilmembers who voted against Resolution Council Series No. C-6859 did not state why they did not believe St. Tammany did not violate the FHA or the ADA.

107.  The councilmembers who voted against Resolution Council Series No. C-6859 did not state why they disagreed with the "Louisiana Office of Community Development's determination that the Project will have no significant impact on the human or natural environment."

108.  Councilman Fitzgerald, who voted against Resolution Council Series No. C-6859, baselessly alleged that "money" to various persons, entities, or the Administration was the force behind the Project. A video of the December 18, 2023 meeting is viewable at https://www.youtube.com/watch?v=Z6RqWrKUybs&t=9523s.

109.  Councilman Fitzgerald also complained that no private entity, without assistance, could develop on the Property, stating:

> This Project I have no doubt would be erected at very great cost to us, at very great cost to us, in terms of, in perpetuity, as this thing develops over 10 years, and the clients walk away, the developers walk away. And it also just in pure dollars and cents, where does the $20 million bucks come from to kick start this project. Well, from us, its tax dollars. You know, we're paying for pain. Why hadn't a private entity developed this 5-acres? Why? Because nobody can make a dime on it. Because it's the wrong location. Because there will be people lined up around this building against it. No private developer can combat that. But when you got $ 20 million bucks up front, you're pretty solid. You got the carrot. And you got the stick. If anybody objects, now we're going to federal court. This isn't extortion, this isn't a threat, this is just something for you to think about. We're going to go to federal court and we're going to say that you have discriminatory practices. It really doesn't matter if you do or not. That's what we're going to say. And we're going to find a judge on board that likes that comment and we're going to cram it down your throat. Get used to it.

110.  Further explaining his reasons for objecting to the Project, Councilman Fitzgerald stated that he viewed a federal suit as "Federal government overreach. Usurping our local politics . . . to the maximum. And the principals walk away with money."

111.  Councilman Fitzgerald also questioned the motives of the Administration in backing the Project, stating:

> Who's for this? The landowner. Why? Money. The realtor. Why? Money. The developer. Why? Money. The Administration? Yeah, it begs, doesn't it. The question begs to be asked.  And I don't mean any underhanded briefcase in the back of a suburban. I mean, who are going to be the contractors here? Who's going to benefit? Who's going to benefit from this project, $35 million dollars. Well that will be interesting to see as it plays out. But I certainly don't want any part of greenlighting this.

112.  Councilman Fitzgerald also stated that he stands by his constituents and he could not find anyone for the Project.

113.   Councilman Fitzgerald directed his most scornful remarks at HUD, stating:

> I don't appreciate the bully pulpit from HUD and its representatives. And that's what it is. Its going on . . . its all over the country. And if you say one remark or anyone says one remark, watch out. We're going to smush you like a little bug because we got the money and we got the Feds. And we really don't give a damn what you think.

114.   St. Tammany's actions in blocking the development of the Project has a disparate impact on protected classes, including African Americans, Hispanics, and persons with disabilities, in St. Tammany.

115.   St. Tammany's endorsement of the discriminatory sentiments espoused by opponents of the Covington Trace Ridge Apartment, including representatives on the Parish Council, has the intent and effect of retaliating against Military Road for proposing an affordable housing complex in Covington and in chilling Military Road and others from proposing similar developments in the future.

116.   Due to the Moratorium Ordinance and St. Tammany's related acts to stop the Project, Military Road could not seek or obtain necessary permits, and could not completely develop the Project.

117.   As a proximate result of the actions and practices described above, Military Road was injured, including, but not limited to, economic losses and the deprivation of the right to develop affordable housing for individuals free from discrimination on the basis of race or disability.

118.   In addition to the injuries Military Road suffered, St. Tammany's actions have the purpose and effect of limiting housing opportunities for protected classes, including African Americans, Hispanics, and persons with disabilities, that would have lived in the Covington Trace Ridge Apartments.

119.  St. Tammany's actions have the purpose and effect of perpetuating racial segregation in housing in Covington because those actions prevented protected classes, including African Americans, Hispanics, and persons with disabilities, from the surrounding areas from moving into the area.

120.  St. Tammany's actions constitute unlawful interference with housing opportunities on the basis of race or disability.

121.  Through the actions described in this Second Amended Complaint, St. Tammany acted intentionally, maliciously, and with willful, malicious, wanton, and reckless disregard for federal and state fair-housing and non-discrimination laws.

122.  On January 5, 2024, Military Road (as well as a prior plaintiff, BCP) filed the Original Complaint against St. Tammany. *See* R. Doc. No. 1.

### E.  The Project is No Longer Moving Forward

123.  St. Tammany's unlawful acts prevented and otherwise interfered with the development of the Project.

124.  Because the Project was no longer viable, Military Road assigned its rights to purchase the Property to a third party.

125.  Military Road's assignment of its right to the Property does not change the fact that Military Road already suffered damages as a result of the Parish's unlawful acts. *See*, *e.g*., *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 817 (9th Cir. 2001) (awarding damages to a developer based on a city's violations of the FHA by denying the developer the ability to obtain local voter approval for a low-rent housing project, even after the developer did

33

not purchase and develop the property); *see also* 42 U.S.C. § 3613(c)(1) (providing "the court may award to the plaintiff actual and punitive damages . . . .").

126.   On January 11, 2024, Military Road agreed to assign its rights to purchase the Property to Sunshine Properties, L.L.C.

127.   On March 1, 2024, Military Road agreed to assign its rights to Claiborne Hill Properties, L.L.C. ("Claiborne").

128.   On March 15, 2024, the Louisiana Court of Appeal for the First Circuit granted Military Road's previously filed writ application, reversed the state district judge's finding that Military Road did not have a right of action, and found that Military Road had a right to appeal the trial court judgment. While that ruling vindicated Military Road's claim in the State Litigation that it had a right to challenge St. Tammany's failure to adhere to its local laws in enacting the Moratorium Ordinance, at the time of the ruling, Military Road had already entered into the binding, confidential contract to assign its rights to purchase the Property to a third party.

129.   After Military Road assigned its rights to purchase the Property, upon information and belief, St. Tammany learned that there would be a closing for the sale of the Property to a third-party buyer, which would take place on April 30, 2024.

130.   Anticipating Military Road would not construct its Project at the Property, in an April 24, 2024 Resolution, St. Tammany decided to vacate, in part, its Moratorium Ordinance, as the only purpose of the moratorium was to prevent Military Road's Project.

131.   In the April 24, 2024 Resolution, the Parish also recognized it violated the FHA, as the resolution provides "in consideration of allegations made in litigation filed against Parish Government concerning the possible disparate ramifications of the moratorium, it is in the best

interest of the Parish to vacate the moratorium as to 5.34 acres bearing the address 72147 Military Road."

132.  The April 24, 2024 Resolution did not address whether the lifting of the Moratorium Ordinance would result in any traffic or drainage infrastructure issues.

133.  As recognized by this Court, the "vacatur of the moratorium ordinance does not annul [the] alleged past damages, so they constitute present harm." R. Doc. No. 29, at 19.

134.  On April 30, 2024, Military Road assigned its rights to purchase the Property to Claiborne.

135.  On April 30, 2024, BCP sold the Property to Claiborne.

### F.  Safety National's Insurance Covers St. Tammany's Liability for this Lawsuit

136.  On February 23, 2024, Military Road (and the prior plaintiff, BCP), filed the First Amended and Supplemental Complaint, adding Safety National as a defendant. *See* R. Doc. No. 10.

137.  Safety National issued to the Named Insured—"St. Tammany Parish Government; Sub-Drainage District No. 1 of Drainage District No. 3"—a Public Entity Excess Retained Limited Liability Insurance Policy Number XPR4067911, with a "Policy Period" from January 1, 2023 to January 1, 2024 (the "Policy"). *See* R. Doc. No. 10-1.

138.  Under the Policy, St. Tammany is provided liability coverage under a General Liability Part, an Automobile Liability Part, and a Public Officials and Employment Practices Liability Part.

139.  The policy limit for each liability coverage is $4,000,000, and the self-insured retention for each liability coverage is $250,000, with a basket aggregate retained limit of $600,000. The cost of the Policy was $406,038.

**<u>Public Officials and Employment Practices Liability</u>**

140.  The insuring clause for the Public Officials and Employment Practices Liability Part, under Endorsement PE 00600 02 22, provides, in pertinent part:

> **INSURING AGREEMENT**
> 1. We will pay those sums, in excess of the **Retained Limit**, that you become legally obligated to pay as damages because of a **wrongful act** to which this Coverage Part applies.

141. Further, under the insuring clause, coverage under the Public Officials and Employment Practices Liability Part of the Policy, under Endorsement PE 00600 02 22, applies only if:

> a.  The **claim** is first made during the **policy period** and reported to us in accordance with Paragraph **C.** of this endorsement.
> b.  The **wrongful act** takes place in the **coverage territory** and occurs:
>     (1) During the **policy period**; or
>     (2) On or after the Retroactive Date shown in the **SCHEDULE**, but before the end of the **policy period**.
> c.  No Insured gave notice relating to such **wrongful act** under any other insurance policy or prior to the **policy period**, no Insured authorized by you to give or receive notice of a **claim** knew or had reason to

> d.  know of circumstances indicating that a **wrongful act** was taking place or had taken place, in whole or in part.

142.  The Insured of the Public Officials and Employment Practices Liability includes the Named Insured, as well as, among others:

> **3.** Any of the following persons or organizations while acting within the course and scope of their duties for the **Named Insured**:
>
> **a.** Elected or appointed officials, trustees, directors or officers.
>
> **b.** Government agencies, authorities, boards, commissions or other units, including their members that are operated by you and subject to your oversight and control.

143. The definition of "wrongful act," in the Common Policy Conditions, Exclusions and Definition Section, is, in pertinent part:

> **36. Wrongful act** means any:
>
> **a.** Actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty committed by an Insured in the performance of the Insured's official duties for you or on your behalf; or

\* \* \*

> All **claim**s arising from the same **wrongful act** or series of related **wrongful acts** committed by one or more Insured in the performance of their official duties for you will be deemed to arise out of one **wrongful act**.

144. Safety National's Policy insures the "wrongful act" alleged in Military Road's Complaint, First Amended and Supplemental Complaint, and Second Amended Complaint because St. Tammany's violations of law constitute an "actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty committed by an Insured in the performance of the Insured's official duties . . . ."

145. The Reporting Requirement, in Endorsement PE 006 00 02 22, provides:

> **C.** The following is added to Section **A. COMMON POLICY CONDITIONS**, Paragraph **14.** in the Common Policy Conditions, Exclusions and Definitions section of this policy, but only as applicable to the Coverage Part(s) modified by this endorsement:
>
> **1.** You or your **Claims Administrator** must notify us in writing of any **claim(s)** made against any Insured(s) as soon practicable, but no later than:
>
> **a.** Sixty (60) days after the end of the **policy period** if the policy is renewed; or
>
> **b.** The last day of any Extended Reporting Period we provided as described in Paragraph **E.** of this endorsement.

146.  The definition of "claim," in the Common Policy Conditions, Exclusions and Definition Section, is:

> **6.  Claim** means a written demand, notice or **suit** received by an Insured demanding payment of money to compensate for injury or loss.

147.  The Policy contains a policy period from 01/01/2023 to 01/01/2024. If the Policy is renewed, then Safety National must be notified on or before March 1, 2024.

148.  By the filing of the February 23, 2024 First Amended and Supplemental Complaint and February 26, 2024 service to Safety National of the complaint, Safety National, if not already notified, has been timely notified of the "claims(s) made against any Insured(s)" no later than "Sixty (60) days after the end of the policy period if the policy is renewed."

**General Liability**

149.  The insuring clause for the General Liability Part, in Part I – General Liability, provides, in pertinent part:

> **A. INSURING AGREEMENT**
>
> **1. Bodily Injury, Property Damage, Personal Injury or Advertising Injury**
>
> We will pay those sums, in excess of the **Retained Limit**, that you become legally obligated to pay as damages because of **bodily injury**, **property damage**, **personal injury** or **advertising injury** to which this Coverage Part applies, caused by an **occurrence**.

150.  Further, under the insuring clause, coverage under the General Liability Part of the Policy applies only if:

> **a.** The **bodily injury**, **property damage**, **personal injury** or **advertising injury** takes place within the **coverage territory** and occurs during the **policy period**; and
>
> **b.** Prior to the **policy period**, no Insured authorized by you to give or receive notice of a **claim** knew that the **bodily injury**, **property damage**, **personal injury** or **advertising injury** had occurred, in whole or in part. If such Insured knew, prior to the **policy period**, that the **bodily injury**, **property damage**, **personal injury** or **advertising injury** had occurred, then any continuation, change or resumption of such **bodily injury**, **property damage**, **personal injury** or **advertising injury** during or after the **policy period** will be deemed to have been known prior to the **policy period**.

151.  The Insured under the General Liability Part includes the Named Insured, as well as, among others:

> 3. Any of the following persons or organizations while acting within the course and scope of their duties for the **Named Insured**:
>
>    a. Elected or appointed officials, trustees, directors or officers.
>
>    b. Government agencies, authorities, boards, commissions or other units, including their members that are operated by you and subject to your oversight and control.

152.  The definition of "Property Damage," in the Common Policy Conditions, Exclusions and Definition Section, is:

> 27. **Property damage** means:
>
>    a. Physical injury to, or destruction of tangible property, including all resulting loss of use of that property; or
>
>    b. Loss of use of tangible property that is not physically injured.
>
>    For the purposes of this insurance, **electronic data** is not tangible property.

153.  Safety National's Policy insures the Property Damage alleged in the Original Complaint, First Amended and Supplemental Complaint, and Second Amended Complaint because St. Tammany's violations of law caused Property Damage in the form of "loss of use of tangible property that is not physically injured" that occurred during the policy period.

154.  The Reporting Requirements (Duties in the Event of an Occurrence, Wrongful Act, Claim or Suit), are, in pertinent part:

> **14. Reporting Requirements (Duties in the Event of an Occurrence, Wrongful Act, Claim or Suit)**
>
> a. You must notify the **Claims Administrator** as soon as practicable of any **occurrence** or **wrongful act** which could reasonably result in a **claim** or **suit**. To the extent possible, notice should include:
>
> (1) How, when, and where the **occurrence** or **wrongful act** took place;
>
> (2) Names and addresses of any injured persons and witnesses; and
>
> (3) The nature and or location of any injury or damage arising out of the **occurrence** or **wrongful act**.

155.  The definition of "Occurrence," in the Common Policy Conditions, Exclusions and Definition Section, is, in pertinent part:

> **23. Occurrence** means:
>
> a. With respect to **bodily injury** or **property damage**, an accident, including continuous or repeated exposure to substantially the same general harmful conditions. All such exposure to substantially the same general harmful conditions will be deemed to arise out of one **occurrence**.

156.  The definition of "claim," in the Common Policy Conditions, Exclusions and Definition Section, is:

> **6. Claim** means a written demand, notice or **suit** received by an Insured demanding payment of money to compensate for injury or loss.

157.  The definition of "suit," in the Common Policy Conditions, Exclusions and Definition Section, is, in pertinent part:

41

> **32. Suit** means a civil proceeding in which damages are claimed because of **bodily injury**, **property damage**, **personal injury**, **advertising injury** or **wrongful acts** to which this insurance applies.

158. The definition of "wrongful act," in the Common Policy Conditions, Exclusions and Definition Section, is, in pertinent part:

> **36. Wrongful act** means any:
>
>    **a.** Actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty committed by an Insured in the performance of the Insured's official duties for you or on your behalf; or

\* \* \*

> All **claim**s arising from the same **wrongful act** or series of related **wrongful acts** committed by one or more Insured in the performance of their official duties for you will be deemed to arise out of one **wrongful act**.

159. By the filing of the February 23, 2024 First Amended and Supplemental Complaint and February 26, 2024 service to Safety National of the complaint, Safety National, if not already notified, has been timely notified of the "wrongful act which could reasonably result in a claim or suit."

# IV.    CLAIMS

### A.  Count 1: Fair Housing Act, 42 U.S.C. § 3604 and 42 U.S.C. § 3617
### (Claim against St. Tammany)

#### i.  St. Tammany Violated the Fair Housing Act

160.   Military Road incorporates and re-alleges as though set out in full herein the allegations contained in the foregoing paragraphs.

161.  St. Tammany's discriminatory Moratorium Ordinance and repeated refusal to fully permit the development and construction of the Project violate the FHA, 42 U.S.C. § 3601, *et seq.* and its implementing regulations at 24 C.F.R. Part 100.

162.  The FHA "prohibits discrimination in the rental or sale of a dwelling based on certain protected characteristics." *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019).

163.  The FHA reflects "the policy of the United States to provide within constitutional limitations, for fair housing throughout the United States." *Id.* at 900–01 (citing 42 U.S.C. § 3604).

164.  "The FHA, as originally enacted in 1968, prohibited discrimination based on race, color, religion, or national origin." *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 728 n.1, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995).

165.  "In 1988, Congress extended coverage to persons with handicaps and also prohibited 'familial status' discrimination, *i.e.*, discrimination against parents or other custodial persons domiciled with children under the age of 18." *Id.* (citing 42 U.S.C. § 3602(k)).

166.  St. Tammany is liable for the violation of Military Road's rights under the FHA, 42 U.S.C. § 3604(a), under which it is unlawful "[t]o sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling

to any person because of race, color, religion, sex, familial status, or national origin" by, *inter alia*, enacting the Moratorium Ordinance and denying Military Road's ability to obtain the permitting it needs to develop, and, thus, prohibiting the development of a construction of an affordable housing development that would have benefited African Americans, Hispanics, and other protected classes.

167.  Further, St. Tammany is liable for the violation of Military Road's rights under the FHA, 42 U.S.C. § 3617, under which "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." St. Tammany's actions have interfered with Military Road's efforts to build and operate an affordable housing development that would have benefited African Americans, Hispanics, and other protected classes, and such actions constitute retaliation against Military Road for proposing a project that would serve these groups.

168.  St. Tammany's conduct was intentional, willful, and made in reckless disregard of the known rights of others.

*a. Discriminatory Intent*

169.  Discriminatory intent may be demonstrated through direct or circumstantial evidence. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 262, 97 S.Ct. 555, 562, 50 L.Ed.2d 450 (1977).

170.  The United States Supreme Court and the U.S. Fifth Circuit outlined the following non-exhaustive list of circumstantial evidence factors that may be probative of a government entity's discriminatory intent: "(1) the historical background of the decision, (2) the specific sequence of

44

events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history. . . ." *Overton v. City of Austin*, 871 F.2d 529, 540 (5th Cir. 1989) (citing *Arlington Heights*, 429 U.S. at 267–68).

171. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. Courts have acknowledged that direct evidence of discrimination is especially unlikely to be forthcoming in cases involving the racial motivation of public officials. *See*, *e.g.*, *Smith v. Town of Clarkton, N.C.*, 682 F.2d 1055, 1064 (4th Cir. 1982) (stating "[m]unicipal officials acting in their official capacities seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority."); *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977) ("As overtly bigoted behavior has become more unfashionable, evidence of intent has become harder to find."); *see also Mhany Mgmt., Inc. v. Cnty. of Nassau,* 819 F.3d 581, 608–10 (2nd Cir. 2016) (upholding district court's finding that references to maintaining the "flavor" and "character" of a city were "code words for racial animus.").

172.  It is well established that government entities can be held liable for capitulating to the discriminatory motives of their constituents, regardless of whether public officials explicitly endorse or personally agree with those motives. *See*, *e.g.*, *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 580 (2d Cir. 2003) (upholding district court's finding of intentional discrimination based, in part, on the history of hostility of neighborhood residents and their pressure on the Mayor and other city officials); *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 49 (2d Cir. 1997) (noting that a city "may not base its decisions on the perceived harm from stereotypes and generalized fears" and "a decision made in the context of strong, discriminatory opposition

45

becomes tainted with discriminatory intent even if the decisionmakers personally have no strong views on the matter."), *recognized as superseded on other grounds by Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 171 n.7 (2d Cir. 2001); *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1124 (2nd Cir. 1987) (noting "[t]he Supreme Court has long held, in a variety of circumstances, that a governmental body may not escape liability . . . merely because its discriminatory action was undertaken in response to the desires of a majority of its citizens."); *Smith v. Town of Clarkton, N.C.*, 682 F.2d 1055, 1066 (4th Cir. 1982) (affirming district court's finding that Town acted with discriminatory intent when it halted development of public housing in response to racially motivated opposition by residents); *United States v. City of Black Jack, Mo.*, 508 F.2d 1179, 1185, n. 3 (8th Cir. 1974) (Eighth Circuit agreeing with Tenth Circuit's opinion that "it is enough for the complaining parties to show that the local officials are effectuating the discriminatory designs of private individuals.") (internal citations omitted); *Jim Sowell Constr. Co., Inc. v. City of Coppell*, 61 F. Supp. 2d 542, 551 (N.D. Tex. 1999) ("[C]itizen comments can demonstrate that public officials acted with bias" where "the circumstances surrounding those statements strongly suggest that the public officials either adopted the citizens' biases or acted directly in response to citizens' discriminatory desires.").

173. HUD regulations provide liability for discriminatory housing practices based on a "person's own conduct" and "where the person knew or should have known of the discriminatory conduct." 24 C.F.R. § 100.7(a)(1)(i)–(iii).

### b. Discriminatory Effect

174. "Moratoriums and other zoning practices are actionable under the FHA and the ADA when they have a discriminatory effect on a protected class." *U.S. v. City of New Orleans*, No. 12-2011 (E.D. La. 04/24/2013), 2013 WL 1767787 at *6.

175. The United States Supreme Court has expressly held that a plaintiff can assert a "disparate-impact" claim under the FHA. *See Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc*., 576 U.S. 519, 135 S.Ct. 2507, 2510, 192 L.Ed.2d 514 (U.S. 2015).

176. Among other things, the FHA's provisions prohibiting discriminatory housing practices proscribe "zoning laws and other housing restrictions that function unfairly to exclude minorities from certain neighborhoods without any sufficient justification." *Id*. at 539. "Suits targeting such practices[,]" including restrictions on multifamily rental housing, "reside at the heartland of disparate-impact liability." *Id*. at 539–40 (citing *Town of Huntington, N.Y. v. Huntington Branch, N.A.A.C.P*., 488 U.S. 15, 16–18 (1988) (per curiam) (invalidating zoning law preventing construction of multifamily rental units); *United States v. City of Black Jack, Mo*., 508 F.2d 1179, 1182–88 (8th Cir. 1974) (invalidating ordinance prohibiting construction of new multifamily dwellings).

177. HUD regulations provide that "[a] practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.500(a). A plaintiff has the initial "burden of proving that a challenged practice caused or predictably will cause a discriminatory effect." 24 C.F.R. § 100(c)(1). Once the plaintiff satisfies this initial requirement, the burden shifts to the defendant who must "prov[e] that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the [] defendant." 24 C.F.R. § 100(c)(2).

### c.  St. Tammany's Actions Discriminated on the Basis of Race

178. The Moratorium Ordinance and related efforts to block Military Road's Project were undertaken with the intent and purpose of making unavailable and denying persons rental housing

because of race in violation of the FHA, 42 U.S.C. § 3604(a), which states that it is unlawful to "make unavailable or deny a dwelling to any person because of race . . . ."

179.  The Project would have included 44 one-bedroom units that would have been be occupied by households with income levels of 80% or less of AMI and 5 two-bedroom units that would have been be occupied by households with income levels of 80% or less of AMI.

180.  As recognized by this Court in a similar FHA dispute that arose in St. Bernard Parish, a moratorium that reduces the supply of rental properties can have a disparate racial impact on protected classes, including African Americans. *See Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Par.*, 641 F.Supp.2d 563, 567 (E.D. La. 2009) (relying on statistical evidence to establish a moratorium ordinance that affected rental properties would have a disparate racial impact).

181.  By interfering with the development of the Project and preventing housing stock that would bring protected classes to Covington, including African Americans and Hispanics, St. Tammany's actions perpetuate and reinforce patterns of segregation in St. Tammany Parish.

182.  Indeed, according to St. Tammany's Consolidated Plan, the Project would have been constructed in an area with a higher percentage of non-white and foreign-born protected classes:

---

**Are any of those racial or ethnic groups located in specific areas or neighborhoods in your community?**

The following census tracts have a higher percentage of non-white and foreign-born protected classes, and have the highest exposure to poverty within St. Tammany Parish:

-   405.01
-   407.04
-   411.03
-   412.02

Neighborhoods include the West 30's, Covington Trace Bridge Apartments, Browns Village Road area of Slidell, and the HWY 433/HWY190 area of Slidell.

---

R. Doc. No. 1-1, 2023–2027 CDBG Consolidated Plan, at 34.

183. St. Tammany's Consolidated Plan identified the "Covington Trace Bridge [sic] Apartments" as located in a neighborhood with a higher percentage of non-white and foreign-born protected classes, further demonstrating that St. Tammany recognizes the need for the development of the Covington Trace Ridge Apartments.

184. As the Project's workforce or low-to-moderate income units would have provided high quality housing to individuals who work in Covington but are not able to find housing in Covington, the majority of whom are protected classes (including African Americans and Hispanics), the discriminatory effect of the Moratorium Ordinance cannot be denied. *See Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Par.*, 641 F.Supp.2d 563, 567 (E.D. La. 2009).

185. A review of the events leading up to the adoption of the Moratorium Ordinance supports a finding that it was adopted with discriminatory intent and would have a discriminatory effect. Among other events, as alleged above, on May 9, 2023, at a meeting between representative of Military Road and government officials, Councilman Fitzgerald specifically asked what type of residents would live in the Project, stating that he did not want Section 8 housing, as provided by the Project. On May 18, 2023, the amended Moratorium Ordinance added language to specifically target the Project. The intent of the Moratorium Ordinance was to prevent the development of apartments that would serve low-to-moderate income residents, which has the effect of racial discrimination. *See Greater New Orleans Fair Housing Action Center v. St. Bernard Parish*, 641 F.Supp. 2d 563 (E.D. La. 2009) (Holding parish government's moratorium ordinance violated FHA in part, based on comments regarding low-income housing that were determined to have racial discriminatory intent and evidence of a disparate racial effect).

186.  The Moratorium Ordinance and St. Tammany's related efforts to block Military Road's Project violates the FHA because these government actions prohibited the development of a construction that would have included rental properties for protected classes.

### d.  St. Tammany's Actions Discriminated on the Basis of Disabilities

187.  The Moratorium Ordinance and related efforts to block Military Road's Project were undertaken with the intent and purpose of making unavailable and denying persons rental housing because of disabilities, in violation of the FHA, 42 U.S.C. § 3604(f)(1), which states that it is unlawful to discriminate "against any person in the terms, conditions, or privileges of sale or rental of dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap . . . ." 42 U.S.C. § 3604(f)(1).

188.  The Project would have included 2 one-bedroom units that would have been occupied by households with at least one member with a disability.

189.  Under the FHA, a handicap is defined as "(1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such impairment, or (3) being regarded as having such an impairment." 42 U.S.C. § 3602(h).

190.  The Moratorium Ordinance and St. Tammany's related efforts to block Military Road's Project violates the FHA because these government actions prohibited the development of a construction that would have included rental properties for persons with disabilities.

### e.  St. Tammany's Actions Lacked a Legitimate Justification

191.  The stated purpose of the Moratorium Ordinance—namely, that population growth has outpaced improvements to traffic and drainage infrastructure—is pretextual. As noted above, OCD issued a public notice determining that the Project would have *no* significant impact on the human or natural environment.

192.  Further, St. Tammany has not explained what traffic and drainage infrastructure issues necessitated a Moratorium Ordinance applicable to the Property and Military Road's Project. Indeed, the language of the Moratorium Ordinance introduced at the Parish Council's May 4, 2023 meeting did *not* apply to the Property and Project. Only 14 days later, on May 18, 2023, the Parish Council introduced an amended version of the Moratorium Ordinance, Ord. Cal. No. 7254AA, which amended the May 4, 2023 introduced version, and added the language "or Highway Commercial Zoning Classifications with Lodging (including apartments, hotels, and motels)." St. Tammany has not provided any explanation for what traffic and drainage infrastructure issues were identified during those 14 days that necessitated expanding the scope of the Moratorium Ordinance to include the Property and Project.

193.  Additionally, concerns about traffic and drainage infrastructure apply equally to single-family developments as they do to multifamily developments, and such concerns would have been successfully addressed by Military Road before receiving the three remaining permits.

194.  Underscoring the lack of a legitimate justification for the Moratorium Ordinance, five councilmembers who voted in favor of Resolution Council Series No. C-6859, the resolution to resolve litigation against Military Road, agreed that it was in St. Tammany's best interest to resolve the litigation because, among other reasons, "in light of the Louisiana Office of Community Development's determination that the Project will have no significant impact on the human or natural environment."

195. The lack of a legitimate justification also supports a finding that the Moratorium Ordinance was adopted with a discriminatory intent. In particular, at the May 9, 2023 meeting between representatives of Military Road and government officials about the Project, Councilman Fitzgerald only expressed concern with the type of residents who would occupy the apartments

and did not address any other concerns about traffic congestion, flooding, zoning, or environmental issues.

196. The Moratorium Ordinance was enacted to block Military Road's mixed-income housing, including workforce or low-to-moderate income housing, which has the effect of disproportionately making unavailable and denying protected classes rental housing based on race in clear violation of the FHA.

197. St. Tammany's actions to prevent the Project, including through the passage of an illegitimate Moratorium Ordinance, are and have been based on discriminatory motives related to the race, disability, or other protected status of the likely residents of the Project.

198. St. Tammany's actions perpetuate and reinforce patterns of segregation in the City of Covington and its housing market.

199. St. Tammany's actions impose a disproportionate harm on protected classes, including African Americans, Hispanics, and persons with disabilities, by depriving them of affordable housing in Covington.

### ii.  Military Road Seeks Actual and Punitive Damages, Attorney's Fees, and Costs

200. Military Road has been injured by St. Tammany's discriminatory conduct and have suffered damages as a result.

201. Military Road seeks actual and punitive damages based on St. Tammany's violation of the FHA. 42 U.S.C. § 3613(c)(1) (providing "the court may award to the plaintiff actual and punitive damages . . . .")

202.  Military Road suffered actual damages based on St. Tammany's violation of the FHA. In its efforts to develop the Project, Military Road incurred approximately $2,324,376.94 in expenses, including:

a.  professional fees incurred to develop the Project, such as fees to negotiate and execute agreements for architectural, fees for engineering services, fees for testing and consulting services, fees to identify and secure sources for construction and permanent financing, fees incurred to establish, implement, and maintain quality controls, fees incurred to ensure compliance with government permits and other applicable rules and regulations, fees for professional architectural services to design the Project in accordance with all applicable federal, state, and local regulations, fees for professional construction management services to obtain all applicable construction contracts, provide construction quality controls, and administer contracts;

b.  fees for consulting and professional services incurred to develop the Project, such as fees for environmental consultants, engineering services—including structural, civil, and MEP engineers (*i.e.*, mechanical, electrical, and plumbing), a design-builder application, geotechnical services, a traffic analysis, a market study, architectural designs, water pressure testing, and public relations;

c.  legal fees incurred to develop the Project;

d.  costs and fees to paid to St. Tammany for government permits and other required fees to develop the Project (such as commercial plan review fees, a commercial new construction fee, multi-family drainage impact fee, multi-family road impact fee, commercial remodel fee, minor subdivision review fee, and other service fees);

    e.   travel and meal expenses incurred to develop the Project, and

    f.   any interest or loan fees incurred as a result of the expenses.

203.  As a result of being unable to develop the Project, Military Road also lost profits, estimated to be $6,267,536.51, including lost profits in the form of management fees (*e.g*., fees that would have been earned to manage the Project from construction until turnover of the Project to a property management company), operational fees (*e.g*., fees that would have been earned to ensure successful construction of the Project until turnover of the Project to a property management company), and lost proceeds from a sale of the Project.

204.  The FHA expressly provides for the recovery of punitive damages. 42 U.S.C. § 3613(c)(1). "Punitive damages are limited to cases in which the [defendant] has engaged in intentional discrimination and has done so with malice or with reckless indifference to the federally protected rights of an aggrieved individual." *United States v. Space Hunters, Inc*., 429 F.3d 416, 427 (2d Cir. 2005) (cleaned up) (finding a district court failed to submit punitive damages question to jury).

205.  Military Road seeks punitive damages in an amount to be awarded at trial.

206.  Military Road seeks attorney's fees and costs based on St. Tammany's violation of the FHA. 42 U.S.C. § 3613(c)(2) (providing "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee and costs.").

207.  Military Road seeks a judgment declaring that the actions of St. Tammany violate the FHA, 42 U.S.C. § 3601  and 42 U.S.C. § 3617, as well as monetary damages, costs, and reasonable attorney's fees based on St. Tammany's violations.

**B. Count 2: Louisiana Equal Housing Opportunity Act, LA. REV. STAT. § 51:2601**
**(Claim against St. Tammany)**

i.  St. Tammany Violated the Louisiana Equal Housing Opportunity Act

208.  Military Road incorporates and re-alleges as though set out in full herein the allegations contained in the foregoing paragraphs.

209.  St. Tammany, through its actions and omissions, and the actions and omissions of its agents described above, are liable for the violation of Military Road's rights under the Louisiana Equal Housing Opportunity Act ("LEHOA"), LA. REV. STAT. § 51:2606(1), under which it is unlawful "[t]o sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or other-wise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, national origin, or natural, protective, or cultural hairstyle."

210.  St. Tammany's actions to prevent the Project, including through the passage of the Moratorium Ordinance, are and have been based on discriminatory motives related to the race of the likely residents of the Project.

211.  St. Tammany's actions impose a disproportionate harm on African Americans, Hispanics and other protected classes by depriving them of affordable housing in Covington.

212.  St. Tammany's actions perpetuate and reinforce patterns of segregation in the City of Covington and its housing market.

213.  Military Road has been injured by St. Tammany's discriminatory conduct and have suffered damages as a result.

214.  St. Tammany's conduct was intentional, willful, and made in reckless disregard of the known rights of others.

215.  St. Tammany's Moratorium Ordinance and related efforts to stop the development and construction of the Project violates the LEHOA.

ii.  Military Road Seeks Actual and Punitive Damages, Attorney's Fees, and Costs

216.  Under LA. REV. STAT. § 51:2613 (statute providing enforcement by private persons) Military Road is entitled to a  judgment declaring that the actions of St. Tammany violate the Louisiana Equal Housing Opportunity Act, LA. REV. STAT. § 51:2606, as well as monetary damages (including, but not limited to, actual and punitive damages), costs, and reasonable attorney's fees based on St. Tammany's violations.

217.  Military Road seeks actual and punitive damages based on St. Tammany's violation of the LEHOA. *See* LA. REV. STAT. § 51:2613(E) (providing the court "may award to a prevailing plaintiff actual damages and punitive damages . . . .").

218.  Under Military Road's LEHOA claim, Military Road seeks the same damages as those sought under Military Road's FHA claim against St. Tammany, including actual damages, *i.e.*, incurred expenses and lost profits, and punitive damages. *See* Count 1.

219.  Military Road seeks reasonable attorney's fees and costs based on St. Tammany's violation of the LEHOA. *See* LA. REV. STAT. § 51:2613 (E) (providing the court may award "court costs and reasonable attorney fees.").

220.  Military Road seeks a judgment declaring that the actions of St. Tammany violate the LEHOA, LA. REV. STAT. § 51:2606(1), as well as monetary damages, costs, and reasonable attorney's fees based on St. Tammany's violations.

### C.  Count 3: Americans with Disabilities Act, 42 U.S.C. § 12131, and Rehabilitation Act, 28 U.S.C. § 794
### (Claim against St. Tammany)

i.  St. Tammany Violated the Americans with Disabilities Act and Rehabilitation Act

221.   Military Road incorporates and re-alleges as though set out in full herein the allegations contained in the foregoing paragraphs.

222.   St. Tammany's Moratorium Ordinance and related efforts to stop the development and construction of the Project violates Title II of the ADA, 42 U.S.C. § 12131, *et seq*. and its implementing regulations at 28 C.F.R. Part 35, and Section 504 of the Rehabilitation Act of 1973, 28 U.S.C. § 794 and its implementing regulations at 24 C.F.R. Part 8.

223.  The ADA prohibits governmental entities from implementing or enforcing housing policies in a discriminatory manner against persons with disabilities. Under the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by such entity." 42 U.S.C. § 12132.

224.   The ADA applies to governmental zoning decisions. *See U.S. v. City of New Orleans*, No. 12-2011 (E.D. La. 04/24/2013), 2013 WL 1767787 at *4.

225.   "Under the ADA, a disability is defined in the same way that the FHA defines a handicap." *Oxford House, Inc. v. City of Baton Rouge*, La., 932 F.Supp.2d 683, 688 (M.D. La. 2013). A disability is "a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Under the ADA, major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating,

sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2).

226.  "The ADA is a 'broad mandate' of 'comprehensive character' and 'sweeping purpose' intended 'to eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American life.'" *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011) (quoting *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001)).

227.  "Moratoriums and other zoning practices are actionable under the FHA and the ADA when they have a discriminatory effect on a protected class." *U.S. v. City of New Orleans*, No. 12-2011 (E.D. La. 04/24/2013), 2013 WL 1767787 at *6.

228.  The Project would have included 2 one-bedroom units that would have been occupied by households with at least one member with a disability.

229.  The Moratorium Ordinance and St. Tammany's refusal to allow the construction of the Project has denied individuals who would qualify as disabled access to quality and affordable housing in the community where they work, which deprives them the opportunity to enjoy equal access to housing.

230.  St. Tammany's Moratorium Ordinance and related efforts to stop the development and construction of the Project violates the ADA and Rehabilitation Act.

<u>ii.  Military Road Seeks Actual Damages, Attorney's Fees, and Costs</u>

231.  The remedies for violations of the ADA and Rehabilitation Act are coextensive with the remedies available in a private cause of action under Title VI of the Civil Rights Act of 1964. *See Barnes v. Gorman*, 536 U.S. 181, 185, 122 S. Ct. 2097, 2100, 153 L. Ed. 2d 230 (2002)

232.  Title II of the ADA specifically incorporates the remedies in the Rehabilitation Act. *See* 42 U.S.C. § 12133 ("The remedies, procedures, and rights set forth in section 794a of Title 29 shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title.").

233.  The Rehabilitation Act incorporates the remedies in Title VI of the Civil Rights Act of 1964. *See* 29 U.S.C. § 794a(a)(2) ("The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d *et seq*.) (and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e-5), applied to claims of discrimination in compensation) shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title.").

234.  Military Road may seek the remedies in Title VI of the Civil Rights Act of 1964 because St. Tammany is a recipient of federal assistance based on St. Tammany's Federal Community Development Block Grant funding. A "recipient" is an entity or person that receives federal financial assistance. *See*, *e.g*., 24 C.F.R. § 1.2(f) (HUD Title VI regulations defining "recipient"). "Federal financial assistance" can be an award or grant of money or may include the use or rental of federal land or property at below market value, federal training, a loan of federal personnel, subsidies, and other arrangements with the intention of providing assistance. *See U.S. Dep't of Transp. v. Paralyzed Veterans of Am*., 477 U.S. 597, 607, n. 11, 106 S.Ct. 2705, 2712, 91 L.Ed.2d 494 (1986).

235.  Upon proving discriminatory intent, Military Road is entitled to receive actual (or compensatory) damages. *See Delano-Pyle v. Victoria Cnty., Tex*., 302 F.3d 567, 574 (5th Cir. 2002) ("A plaintiff asserting a private cause of action for violations of the ADA or the [Rehabilitation Act] may only recover compensatory damages upon a showing of intentional

discrimination."); *see also Hernandez v. U.S. Bank, N.A.*, No. 3:13-CV-2164-O, 2013 WL 6840022, at *5 (N.D. Tex. Dec. 27, 2013) (stating the term "actual damages" is synonymous with "compensatory damages").

236.  Just like Military Road's claims that St. Tammany violated the FHA, under Military Road's claim that St. Tammany violated the ADA and Rehabilitation Act, Military Road is entitled to seek, and does seek, actual damages.

237.  Under Military Road's claim that St. Tammany violated the ADA and Rehabilitation Act, Military Road seeks the same actual damages as those sought under Military Road's FHA claim against St. Tammany, including incurred expenses and lost profits. *See* Count 1.

238.  Under Military Road's claim that St. Tammany violated the ADA and Rehabilitation Act, Military Road is entitled to seek reasonable attorney's fees and costs. *See* 29 U.S.C. § 794a (providing the "court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs").

239.  Military Road seeks a judgment declaring that St. Tammany's actions violate the ADA, 42 U.S.C. § 12131, *et seq*., and Rehabilitation Act, 28 U.S.C. § 794, as well as monetary damages, costs, and reasonable attorney's fees based on St. Tammany's violations.

### D.  Count 4: Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d et seq. (Claim against St. Tammany)

#### i.  St. Tammany Violated the Civil Rights Act

240.  Military Road incorporates and re-alleges as though set out in full herein the allegations contained in the foregoing paragraphs.

241. St. Tammany, through its actions and the actions of its agents, are liable for the violation of Military Road's rights under Title VI of the Civil Rights Act of 1964, 42 U.S.C. §

2000d *et seq.*, under which, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." The discrimination from which Military Road suffered directly and adversely impacted the rights of the intended beneficiaries of the Covington Trace Ridge Apartments—including African Americans, Hispanics, and other protected classes—to be free from discrimination.

242.  Military Road may seek the remedies in Title VI of the Civil Rights Act of 1964 because St. Tammany is a recipient of federal assistance based on St. Tammany's Federal Community Development Block Grant funding. A "recipient" is an entity or person that receives federal financial assistance. *See*, *e.g.*, 24 C.F.R. § 1.2(f) (HUD Title VI regulations defining "recipient"). "Federal financial assistance" can be an award or grant of money or may include the use or rental of federal land or property at below market value, federal training, a loan of federal personnel, subsidies, and other arrangements with the intention of providing assistance. *See* U.S. *Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 607, n. 11, 106 S.Ct. 2705, 2712, 91 L.Ed.2d 494 (1986).

243.  St. Tammany's Moratorium Ordinance and related efforts to stop the development and construction of the Project violates the Title VI of the Civil Rights Act of 1964.

ii.  Military Road Seeks Actual Damages, Attorney's Fees, and Costs

244.  Military Road has been injured by St. Tammany's discriminatory conduct and have suffered damages as a result.

245.  "[A] Title VI plaintiff must prove discriminatory intent in order to recover compensatory damages." *Sneed v. Austin Indep. Sch. Dist.*, 490 F. Supp. 3d 1069, 1083, (W.D. Tex. 2020) (internal citation omitted).

246.  Just like Military Road's claims that St. Tammany violated the FHA, under Military Road's claim that St. Tammany violated Title VI of the Civil Rights Act of 1964, Military Road is entitled to seek, and does seek, actual damages.

247.  Under Military Road's claim that St. Tammany violated Title VI of the Civil Rights Act of 1964, Military Road seeks the same actual damages as those sought under Military Road's FHA claim against St. Tammany, including incurred expenses and lost profits. *See* Count 1.

248.  Under Military Road's claim that St. Tammany violated Title VI of the Civil Rights Act of 1964, Military Road is entitled to seek reasonable attorney's fees and costs. *See* 42 U.S.C. § 1988(b) (providing in any action or proceeding to enforce a provision of Title VI of the Civil Rights Act of 1964, "the court, in its discretion, ,ay allow the prevailing party . . .a reasonable attorney's fee as part of the costs. . . .").

249.  Military Road seeks a judgment declaring that the actions of St. Tammany violate Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*., as well as monetary damages, costs, and reasonable attorney's fees based on St. Tammany's violations.

### E.  Count 5: Direct Action Claim, LA REV. STAT. § 22:1269
### (Claim against Safety)

250.  Military Road incorporates and re-alleges as though set out in full herein the allegations contained in the foregoing paragraphs.

251.  Louisiana's Direct Action Statute, LA REV. STAT. § 22:1269(A), provides, in pertinent part:

> No policy or contract of liability insurance shall be issued or delivered in this state, unless it contains provisions to the effect that the insolvency or bankruptcy of the insured shall not release the insurer from the payment of damages for injuries sustained or loss occasioned during the existence of the policy.

252.  Louisiana's Direct Action Statute further states that "[t]he injured person . . . shall have a right of direct action against the insurer within the terms and limits of the policy . . . ." LA REV. STAT. § 22:1269(B)(1).

253.  Military Road asserts a claim under Louisiana's Direct Action Statute, LA REV. STAT. § 22:1269 against Safety National for all of Military Road's injuries based on claims asserted against St. Tammany.

254.  Military Road seeks a judgment holding Safety National liable for all amounts St. Tammany owes Military Road's for any damages, fees, and costs suffered by Military Road.

255.  Military Road seeks a judgment declaring defendants, St. Tammany and Safety, to be held jointly, severally, and/or solidarily liable with each other for all damages, fees, and costs suffered by Military Road.

## V.    **PRAYER FOR RELIEF**

WHEREFORE Military Road Revitalization Company, LLC prays that this Second Amended Complaint be deemed good and sufficient, that Defendants, the St. Tammany Parish Government and Safety National Casualty Corporation, be ordered to appear and defend said suit, and that after all due proceedings are had, there be judgment rendered herein in favor of Military Road Revitalization Company, LLC and against Defendants, the St. Tammany Parish Government and Safety National Casualty Corporation, for all relief to which Military Road is entitled, including but not limited to:

A.    A judgment against St. Tammany declaring that the actions of St. Tammany violate the Fair Housing Act, 42 U.S.C. § 3601 and 42 U.S.C. § 3617;

B. A judgment against St. Tammany declaring that the actions of St. Tammany violate the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.*, and Section 504 of the Rehabilitation Act of 1973, 28 U.S.C. § 794;

C. A judgment against St. Tammany declaring that the actions of St. Tammany violate the Louisiana Equal Housing Opportunity Act, LA. REV. STAT. § 51:2606;

D. A judgment against St. Tammany declaring that the actions of St. Tammany violate Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*;

E. A judgment against Safety National holding Safety National liable for all amounts St. Tammany owes Military Road for any damages, fees, and costs suffered by Military Road;

F. A judgment declaring defendants, St. Tammany and Safety National, held jointly, severally, and/or solidarily liable with each other for all damages, fees, and costs suffered by Military Road;

G. An award of actual (or compensatory) damages, including, but not limited to:

  i. professional fees incurred to develop the Project, such as fees to negotiate and execute agreements for architectural, fees for engineering services, fees for testing and consulting services, fees to identify and secure sources for construction and permanent financing, fees incurred to establish, implement, and maintain quality controls, fees incurred to ensure compliance with government permits and other applicable rules and regulations, fees for professional architectural services to design the Project in accordance with all applicable federal, state, and local regulations, fees for professional construction management services to obtain all applicable

        construction contracts, provide construction quality controls, and administer contracts;

ii.     fees for consulting and professional services incurred to develop the Project, such as fees for environmental consultants, engineering services—including structural, civil, and MEP engineers (*i.e.*, mechanical, electrical, and plumbing), a design-builder application, geotechnical services, a traffic analysis, a market study, architectural designs, water pressure testing, and public relations;

iii.    legal fees incurred to develop the Project;

iv.    costs and fees to paid to St. Tammany for government permits and other required fees to develop the Project (such as commercial plan review fees, a commercial new construction fee, multi-family drainage impact fee, multi-family road impact fee, commercial remodel fee, minor subdivision review fee, and other service fees);

v.     travel and meal expenses incurred to develop the Project;

vi.    any interest or loan fees incurred as a result of the expenses; and

vii.    lost profits, including lost profits in the form of management fees (*e.g.*, fees that would have been earned to manage the Project from construction until turnover of the Project to a property management company), operational fees (*e.g.*, fees that would have been earned to ensure successful construction of the Project until turnover of the Project to a property management company), and loss of sale proceeds.

H.  An award of punitive damages, including, but not limited to, pursuant to 42 U.S.C. § 3613(c)(1) and LA. REV. STAT. § 51:2613(E); and

I.  Reasonable attorney's fees and costs incurred in this action, including, but not limited to, pursuant to 42 U.S.C. §§ 3613(c)(2) and 12205, 28 C.F.R. § 35.175, 29 U.S.C. § 794a(b), 42 U.S.C. § 1988(b).

Respectfully submitted,

/s/James M. Garner
JAMES M. GARNER #19589
STUART D. KOTTLE #37194
**SHER GARNER CAHILL RICHTER
KLEIN & HILBERT, L.L.C.**
909 Poydras Street - 28th Floor
New Orleans, LA 70112
Telephone: 504-299-2100
Facsimile: 504-299-2300
jgarner@shergarner.com
skottle@shergarner.com
**Attorneys for Military Road
Revitalization Company, LLC**